OLYMPIC PRODUCTS COMPANY, A DIVISION OF CONE MILLS CORPORA-
TION, Plaintiff v. ROOF SYSTEMS, INC., CARLISLE CORPORATION,
D/B/A CARLISLE TIRE & RUBBER COMPANY, CAROLINA STEEL COR-
PORATION, AND CRAVEN STEEL, INC., Defendants, and CAROLINA
STEEL CORPORATION, Third-Party Plaintiff v. CARLOS M. SUAREZ,
T/A and D/B/A CARLOS M. SUAREZ AND ASSOCIATES, Third-Party De-
FENDANT

No. 8618SC1292

(Filed 5 January 1988)

1. **Negligence § 2; Contracts § 15— failure of roof—privity of contract between roofing manufacturer and building owner—not required**

In a negligence action arising from the collapse of a roof, the building owner need not prove privity of contract with the manufacturer of the roof membrane in order to prove that the manufacturer owed it a duty.

2. **Negligence § 2; Evidence § 29.2— collapse of roof—negligence—admissibility of contract with third-party roof manufacturer**

In a negligence action resulting from the collapse of a roof caused by an improperly installed drain opening, a contract between the manufacturer of the roof membrane (Carlisle) and the installer of the membrane (Roof Systems) was admissible because the parties had authenticated the document under N.C.G.S. § 8C-1, Rule 901(a) by stipulating before trial that the document was genuine. The document was material in that the existence of a contract is a relevant factor in a negligence action to the extent that it shows the relationship of the parties and the nature and extent of the duty of care.

3. **Negligence § 29.1— reroofing—clogged drain—collapse of roof—liability of manufacturer**

In a negligence action arising from the collapse of a roof due to a partially blocked drain after reroofing where the roof membrane was manufactured by Carlisle and installed by Roof Systems on Olympic's building, the evidence viewed in the light most favorable to Olympic was sufficient to demonstrate that Carlisle breached its duty to Olympic to inspect the roof and report to Olympic any variations from Carlisle's specifications and, since the drains would not have been restricted if the drain openings had complied with Carlisle's specifications and the roof would not have collapsed but for the drain restrictions, the evidence was also sufficient to show that Carlisle's failure to report the lack of compliance was a proximate cause of Olympic's injury. Even though Olympic knew of the condition of the drain openings prior to the collapse of its building, it did not know that the drain openings did not comply with Carlisle's specifications, the building code, or the standard of roofing contractors in general.

4. **Negligence § 7— collapse of roof—willful or wanton negligence by installer of roof membrane—summary judgment for defendant**

In an action resulting from the collapse of a roof due to blocked roof drains, the trial court did not err by granting summary judgment for defend-

ant Roof Systems on plaintiff's claim for willful and wanton negligence where there was no genuine dispute as to the relevant evidence; no one employed by Roof Systems was aware of the building's noncompliance with the building code; the inspector for the roof membrane manufacturer had approved the roof installation a few days before the collapse; and, even if Roof Systems had the duty to check the building's compliance with the building code, the failure to check the code does not indicate a reckless indifference which rises to the level of willful or wanton negligence.

**5. Negligence §§ 13.1, 1.3— collapse of roof—contributory negligence—violation of building code**

The building code imposes liability on any person who constructs, supervises construction, or designs a building or alteration thereto and violates the code such that the violation proximately causes injury or damage; in addition, if a building owner knows or has reason to know of a building code violation and fails to take reasonable steps to remedy the violation, he may be found liable if the violation proximately causes injury or damage.

**6. Negligence § 35.2— collapse of roof—no contributory negligence by building owner**

In an action arising from a collapsed roof due to partially blocked drains, the trial court erred by granting a directed verdict for defendant based on the actions of plaintiff building owner's v.p. in charge of engineering when the evidence, viewed in the light most favorable to plaintiff, was not sufficient to show that the v.p. designed, constructed or supervised the reroofing project. The v.p. delegated the task to others rather than taking an active role himself; there was insufficient evidence that the v.p. knew or should have known of the structural inadequacy of the roof either before or after the new roof was installed; and the evidence tended to show that the v.p. was at least implicitly assured by the roofing consultant that the load bearing capacity of the roof was adequate for the new roof.

**7. Negligence § 34.2; Principal and Agent § 1— collapse of roof—negligence of roofing consultant—not attributed to building owner**

In an action arising from the collapse of a roof due to blocked drains after reroofing, a directed verdict for defendant based on plaintiff building owner's negligence through a roofing consultant was erroneous where the evidence was sufficient for the jury to have found that the building owner did not have the right to control the details of the roofing consultant's work; the roofing consultant, Suarez, was engaged in the independent business of roofing consultant and was hired for his knowledge and experience in that area; he was paid a flat fee for drafting plans and by the hour for supervising and inspecting roofing work; there were no deductions for taxes or employee benefits; there was no evidence of Suarez's power to enter contracts on behalf of the building owner; and the extent of his supervisory authority over the roofing company was not clear. Reasonable men could differ on the inferences to be drawn from the evidence.

Olympic Products Co. v. Roof Systems, Inc.

**8. Negligence § 35.2— collapsed roof—contributory negligence in hiring of roofing consultant—directed verdict inappropriate**

In an action arising from a collapsed roof, a directed verdict against plaintiff building owner on the grounds of contributory negligence in that plaintiff's reliance on a roofing consultant was not reasonable was not proper where the evidence was sufficient to show that plaintiff's reliance on the consultant was reasonable given the investigation plaintiff made into the consultant's background as well as the consultant's work in drafting the reroofing plans, securing the bids, and helping draft the contract between plaintiff and the roofing contractor.

**9. Negligence § 35.2— collapse of roof—failure to follow general engineering principles—no contributory negligence**

Plaintiff was not contributorily negligent in having its building reroofed in that it did not have a structural engineer investigate the building for structural weaknesses because the evidence was sufficient to show that this duty, assuming there was one, was delegated to a roofing consultant, and this violation could not be imputed to plaintiff unless it could be shown that the consultant was acting as plaintiff's servant or agent.

**10. Negligence § 35.2— collapse of roof—knowledge of condition of roof—no contributory negligence**

The trial court erred by directing a verdict for defendant in an action resulting from the collapse of a roof based on plaintiff building owner's failure to act to correct any negligence of a roofing contractor in that plaintiff knew or should have known of the condition of the roofing installation where the evidence revealed that, when plaintiff discovered the problem with the roof drains, the roofing consultant was called and asked to contact the roofing contractor to have them send an employee to check on the drain.

**11. Negligence § 5.2— collapse of roof—duty to ascertain whether building would support new roof—reroofing not intrinsically dangerous**

In an action resulting from the collapse of a roof after a reroofing project, plaintiff building owner was not under a nondelegable duty to check the roof support because reroofing a building is not within the purview of intrinsically dangerous or especially hazardous work.

**12. Negligence § 19— collapsed roof—negligence of one agent not imputed to principal in action against other agent**

Where a building owner brought an action against a roofing consultant and the roofing contractor after its roof collapsed, the agents were not allowed to implead the negligence of each other to bar the principal's claim against them under the doctrine of imputed contributory negligence.

APPEAL by plaintiff from *Lake, Judge*. Judgment entered 16 September 1986 in Superior Court, GUILFORD County. Heard in the Court of Appeals 9 April 1987.

*Smith Helms Mulliss & Moore, by Vance Barron, Jr., and Jonathan Berkelhammer, for plaintiff-appellant Olympic Products Company, a division of Cone Mills Corporation.*

*Henson Henson Bayliss & Coates, by Perry C. Henson and Jack B. Bayliss, Jr., for defendant-appellee Roof Systems, Inc.*

*Womble Carlyle Sandridge & Rice, by Keith A. Clinard and Timothy G. Barber, for defendant-appellee Carlisle Corporation d/b/a Carlisle Tire and Rubber Company.*

GREENE, Judge.

This is a civil action filed by plaintiff, Olympic Products (hereinafter "Olympic"), seeking damages in the amount of $501,124.66 and loss of profits in the amount of $93,670.70. Plaintiff's claims for relief are founded on the alleged negligence of defendant Carlisle Corporation (hereinafter "Carlisle") and the alleged negligence and wanton negligence of defendant Roof Systems, Inc. (hereinafter "Roof Systems"). Defendants filed answers denying any negligence and alleging plaintiff's contributory negligence. In reply, plaintiff denied contributory negligence and alleged defendants had the last clear chance to avoid the damage.

Defendants filed motions for summary judgment and the trial court entered summary judgment in favor of defendant Roof Systems on plaintiff's claim for wanton negligence. At the close of plaintiff's case, the trial court granted Carlisle's motion for directed verdict as to all of plaintiff's claims. The trial court also allowed Roof Systems' motion for directed verdict on the issues of contributory negligence and last clear chance. Plaintiff appeals from the summary judgment and the order for directed verdicts.

Plaintiff's evidence tended to show that Randy Mize, vice president in charge of engineering for Olympic, employed Carlos Suarez, a roofing consultant, for a reroofing project to be done on one of Olympic's plants. Suarez was to submit a reroofing program for the plant, help select a contractor to reroof the building, and supervise and inspect the reroofing work. The evidence also tended to show that Suarez has degrees in architecture and engineering from the University of Havana, Cuba, which are not recognized in the United States. Suarez was not licensed in North Carolina as either an architect or an engineer. Mize knew that

Suarez could not perform any type of activity that required a license, such as engineering or architectural work, but did know that Suarez could act as a roofing consultant. Suarez eventually recommended a rubber membrane roof to be held down by rock ballast.

The contractor selected for the project was defendant Roof Systems. Olympic and Roof Systems entered into a contract in which Roof Systems agreed to install the roof membrane in such a manner that the manufacturer of the membrane, defendant Carlisle, would issue its standard warranty. The parties further agreed that materials used in the project would be in accordance with the manufacturer's recommendations.

Roof Systems completed the reroofing project on 5 May 1982. On 18 May 1982, the roof was inspected by a Carlisle inspector, several employees of Roof Systems, and Suarez. The building had several drains which were to take water from the roof and away from the building. Each roof drain had a drain opening and a drainpipe. The drain opening acted as a funnel to the smaller drainpipe. The specifications prepared by Carlisle indicated that the rubber membrane should be spread over the drain opening, clamped at the opening's edge, and then cut away to the interior edge of the drain opening. Carlisle's inspector had been instructed by Carlisle in training sessions that the membrane over the drain opening should have a hole cut at least as large as the drainpipe leading from the drain opening. However, on the Olympic plant, the evidence tended to show the openings cut in the membrane over each of the drains were over fifty percent smaller than the drainpipes. Carlisle's inspector noted several deficiencies in his report on 18 May 1982 but none of them concerned the drain openings. In early to mid-May and again on 25 May 1982, Mize went onto the roof and observed that the membrane had not been cut out to the width of the drain opening. On each occasion, Mize called Suarez and requested that someone cut back the membrane.

On the afternoon of 26 May 1982, an employee of Roof Systems went onto the plant's roof at Mize's request and checked the drain openings. It was raining at the time and had been raining for several hours. It was later discovered that between the hours of 3:00 p.m. and 7:30 p.m., a total of five inches of rain fell around

the plant. The holes in the membrane over the drain openings were covered with cross-hatch wire mesh with one-half inch openings to prevent debris from flowing down the drainpipe. If the drains were blocked, water would accumulate on the roof against one of the parapet walls. Roof Systems' employee found debris clogging the screens in several of the drains and water collecting on the roof. He removed the debris but did nothing further. At approximately 6:00 p.m. that evening, the portion of the roof nearest the plant's west wall collapsed. The next morning another Roof Systems' representative came to the plant and informed Mize that Roof Systems had sent someone the day before to cut the rubber membrane out to the interior edge of the drain opening.

During plaintiff's case, a great deal of detailed evidence was presented concerning the structure of the building, the installation of the roof, the amount of rainfall before the collapse, and the applicable provisions of the North Carolina Building Code. N.C.G.S. Sec. 143-136 *et seq.* (1983). Briefly, the evidence tended to show several Building Code violations. The holes cut in the rubber membrane at the drain openings indicated the holes did not comply with the Building Code because they were smaller than the Code required. The wire mesh covering the holes in the membrane did not meet Building Code standards either. The steel column at the plant's west wall had been improperly constructed when the plant was built in 1969 and did not meet the strength requirements of the Building Code. The rubber membrane and the wire mesh over the drain openings restricted the roof's drainage. Because of this restricted drainage, water accumulated on the roof to the approximate depth of five inches just before the collapse. Testimony indicated that water would not have accumulated and the roof would not have collapsed if the drain openings had not been partially covered by the rubber membrane and the wire mesh. Testimony also indicated that, if the steel column had complied with the Building Code requirements at the time of the building's construction, the roof would not have collapsed even with an accumulation of five inches of water.

Olympic presented evidence from an expert in the field of civil engineering and structural design who testified the installation of the rubber membrane at the drain openings did not meet the standard of care and workmanship of roofing contractors. The

expert also testified that approval of the drain openings by the roofing inspector from Carlisle did not meet the standard of care for roofing inspectors.

Olympic did not have a contract with Carlisle. The contract between Olympic and Roof Systems required that all details of the roof installation be approved by Carlisle. The contract between Roof Systems and Carlisle required Roof Systems to follow Carlisle's specifications in installing the roof and, at Roof Systems' expense, make changes Carlisle deemed necessary for a proper installation.

---

This appeal presents numerous issues but we shall primarily address the following: I) Whether there was sufficient evidence to direct a verdict for defendant Carlisle on the issue of whether it, as the manufacturer of the roof membrane, owed a duty to Olympic, the building owner, to properly inspect the roof application; II) whether defendant Roof Systems was entitled to summary judgment on the issue of its wanton negligence for failing to cut back the membrane around the drains; and III) whether there was sufficient evidence to direct a verdict against Olympic on the issue of its contributory negligence: (A) for violating the Building Code; (B) for negligently hiring and relying on Carlos Suarez as a roofing consultant; (C) for violating general engineering principles; (D) for failing to correct the alleged negligence on the part of defendants; and (E) for exercising a nondelegable duty which would render Olympic liable for the negligence of persons it hired to perform the reroofing work.

I

*Negligence of Defendant Carlisle*

A motion for directed verdict pursuant to Rule 50(a) of the North Carolina Rules of Civil Procedure, N.C.G.S. Sec. 1A-1 (1983), presents the question of whether plaintiff's evidence is sufficient to carry the case to the jury:

> In passing on this motion, the trial judge must consider the evidence in the light most favorable to the non-movant, and conflicts in the evidence together with inferences which may be drawn from it must be resolved in favor of the non-movant. The motion may be granted only if the evidence is insuf-

ficient to justify a verdict for the non-movant as a matter of law.

*Arnold v. Sharpe,* 296 N.C. 533, 537, 251 S.E. 2d 452, 455 (1979) (citation omitted).

Olympic seeks recovery against Carlisle for failing to exercise reasonable care in inspecting the installation of the membrane. It argues Carlisle owed it a duty to inspect and that there was sufficient evidence, when considered in the light most favorable to it, to show that Carlisle breached that duty.

[1] "Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law." *Pinnix v. Toomey,* 242 N.C. 358, 362, 87 S.E. 2d 893, 897 (1955). The duty may arise by statute or by operation of law. *Id.* "The law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm . . . ." *Council v. Dickerson's, Inc.,* 233 N.C. 472, 474, 64 S.E. 2d 551, 553 (1951). A duty of care may arise out of a contractual relationship, "the theory being that accompanying every contract is a common-law duty to perform with ordinary care the thing agreed to be done, and that a negligent performance constitutes a tort as well as a breach of contract." *Pinnix,* 242 N.C. at 362, 87 S.E. 2d at 898. The contract creates "the state of things which furnishe[s] the occasion for the tort." *Council,* 233 N.C. at 474, 64 S.E. 2d at 552.

In this case, there was no contract between plaintiff and Carlisle. However, there was a contract between Carlisle and Roof Systems. Olympic need not prove privity of contract with Carlisle in order to prove that Carlisle owed it a duty. "It is well settled in North Carolina that privity of contract is not required in order to recover against a person who negligently performs services for another and thus injures a third party." *Ingle v. Allen,* 71 N.C. App. 20, 26, 321 S.E. 2d 588, 594 (1984), *disc. rev. denied,* 313 N.C. 508, 329 S.E. 2d 391 (1985). In *Quail Hollow East Condominium Ass'n v. Donald A. Scholz Co.,* 47 N.C. App. 518, 522, 268 S.E. 2d 12, 15, *disc. rev. denied,* 301 N.C. 527, 273 S.E. 2d 454 (1980), this Court stated:

[U]nder certain circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person for injuries resulting from his failure to exercise reasonable care in such undertaking.

This duty to protect third parties from harm arises under circumstances where the party is in a position so that "anyone of ordinary sense who thinks will at once recognize that if he does not use ordinary care and skill in his own conduct with regard to those circumstances, he will cause danger of injury to the person or property of the other." *Davidson & Jones, Inc. v. County of New Hanover*, 41 N.C. App. 661, 666, 255 S.E. 2d 580, 584, *disc. rev. denied*, 298 N.C. 295, 259 S.E. 2d 911 (1979).

[2] Therefore, we must determine if Carlisle rendered services to Roof Systems which it should have recognized were necessary for Olympic's protection. We first must determine what services defendant Carlisle agreed to provide to Roof Systems. In making that determination, it is necessary to examine the terms of the contract between those parties. However, the trial judge refused to allow plaintiff to introduce the written contract between Roof Systems and Carlisle. Carlisle objected to the introduction of the contract on the basis of authentication and materiality. Both contentions are meritless.

Before trial, the parties stipulated that the document was genuine. Under Rule 901(a) of the North Carolina Rules of Evidence, such a stipulation authenticates a document. N.C.G.S. Sec. 8C-1, Rule 901(a) (1986). As to the issue of the document's materiality, the existence of a contract is a relevant factor in a negligence action to the extent that it shows the relationship of the parties and "the nature and extent of the common-law duty on which the tort is based." *Pinnix*, 242 N.C. at 362, 87 S.E. 2d at 898. Thus, the exclusion of the contract was error. However, we hold that the error did not prejudice plaintiff because the essence of the contract was admitted into evidence through direct testimony.

[3] The contract required Roof Systems to "[f]ollow and adhere to all current, future and revised Carlisle Roofing Systems specifications, installation instructions and procedures as submitted from Carlisle to [Roof Systems] from time to time." Furthermore,

Roof Systems was required to allow Carlisle to inspect the premises and "approve installation of the Roofing System and direct [Roof Systems] to make such changes at [Roof Systems'] own expense as Carlisle deems necessary for proper installation."

The inspector for Carlisle testified as follows:

Q. But you were sent [to the plant] on behalf of Carlisle to determine whether there had been a proper installation; were you not?

A. I was sent there to check to see that the roof was installed to our specifications.

Q. Okay. And that's what you mean by "a proper installation?"

A. Meeting our specifications? Yes.

Plaintiff's evidence was sufficient to show that under Carlisle's contract with Roof Systems, Carlisle was to inspect the building and determine whether it met Carlisle's specifications for a proper installation. The evidence is also sufficient to show that Carlisle knew or should have known: (1) that compliance with its specifications was necessary for Olympic's protection; and (2) that the drain openings did not comply with its specifications. Further, the evidence was sufficient to show that Carlisle's inspector approved these drain openings and that the openings met neither the general standard of care of roofing contractors nor complied with the Building Code.

When viewed in the light most favorable to plaintiff, the evidence was thus sufficient to demonstrate that Carlisle breached its duty to Olympic to inspect the roof and report to Olympic any variance from Carlisle's specifications. Since plaintiff's evidence was that the drains would not have been restricted if the drain openings had complied with Carlisle's specifications and that the roof would not have collapsed but for the drain restrictions, the evidence also was sufficient to show that Carlisle's failure to report the lack of compliance was a proximate cause of Olympic's injury.

Defendant Carlisle argues that even if it had a duty, Olympic's knowledge of the defective nature of the drain openings relieved it of the duty. The general rule is that when a person has

knowledge of a dangerous condition, the failure to warn him of that condition is without legal significance. *Petty v. Cranston Print Works Co.*, 243 N.C. 292, 304, 90 S.E. 2d 717, 725 (1956). We find Carlisle's contention to be meritless. Construing the evidence in the light most favorable to plaintiff, the evidence was sufficient to show that even though Olympic knew of the condition of the drain openings prior to the collapse of its building, it did not know the drain openings did not comply with Carlisle's specifications, the Building Code or the standard of roofing contractors in general. Therefore, there was not sufficient evidence to show that Carlisle was relieved of the duty to report that the roof did not comply with its specifications. Accordingly, the court's entry of directed verdict for Carlisle on the issue of its negligence was error.

II

*Summary Judgment for Roof Systems*

[4] The trial judge allowed defendant Roof Systems' motion for summary judgment and dismissed plaintiff's claim for wanton negligence against Roof Systems. Plaintiff contends that the forecast of evidence presented a genuine issue of material fact as to the reckless disregard of safety exhibited by Roof Systems. The test for summary judgment is, first, whether there is a genuine issue of material fact, and second, whether the moving party is entitled to judgment as a matter of law. *Gregory v. Perdue, Inc.*, 47 N.C. App. 655, 267 S.E. 2d 584 (1980).

As to what constitutes willful and wanton negligence, our Supreme Court stated in *Akzona, Inc. v. Southern Ry. Co.*, 314 N.C. 488, 334 S.E. 2d 759 (1985):

An act is done wilfully when it is done purposely and deliberately in violation of law, or when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason. "The true conceptions of wilful negligence involves [sic] a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract, or which is imposed on the person by operation of law."

An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.

*Id.* at 495, 334 S.E. 2d at 763 (quoting *Foster v. Hyman*, 197 N.C. 189, 191, 148 S.E. 36, 37-38 (1929)). *See also Wagoner v. North Carolina R.R.*, 238 N.C. 162, 168, 77 S.E. 2d 701, 706 (1953) ("Wanton and willful negligence rests on the assumption that [a person] knew the probable consequences, but was recklessly, wantonly or intentionally indifferent to the results.").

In this case no genuine dispute exists as to the relevant evidence. Our review of the evidence convinces us that the failure to enlarge the drain holes on 26 May 1982, the day of the collapse, was not a willful or wanton act. No one employed by Roof Systems was aware of the building's noncompliance with the Building Code. In addition, the inspector for defendant Carlisle had approved the roof installation just a few days before the collapse. Even if Roof Systems had the duty to check the building's compliance with the Code, which plaintiffs have not asserted, under these facts, the failure to check Code compliance prior to applying the roof membrane does not indicate a reckless indifference which rises to the level of willful or wanton negligence. *See Starkey v. Cimarron Apartments*, 70 N.C. App. 772, 774-75, 321 S.E. 2d 229, 231 (1984) (landlord's knowledge of lack of fire walls in apartments in violation of law and its failure to remedy the same was not willful and wanton negligence and entitled it to summary judgment on the issue), *disc. rev. denied*, 312 N.C. 798, 325 S.E. 2d 633 (1985). Therefore, the evidence does not support a genuine issue of whether Roof Systems was willfully negligent because it knew that damage would probably result from its failure to enlarge the drain openings. Accordingly, the trial judge's allowance of the summary judgment motion for Roof Systems was not error.

### III

#### Contributory Negligence of Plaintiff

Defendants contend Olympic was contributorily negligent in several respects: (A) for specifying and allowing the installation of a roof membrane in violation of the Building Code; (B) for negligently hiring Suarez and relying on him instead of hiring a licensed structural engineer to determine whether the building

would support the new roof; (C) for allowing installation of the roof membrane in contravention of general engineering principles; (D) in failing to correct the negligence of Roof Systems; and (E) for breaching an alleged nondelegable duty arising from an "intrinsically dangerous" activity which would render it liable for the negligence of persons it hired to perform the work.

Since the trial court granted a directed verdict finding Olympic contributorily negligent, we can affirm that verdict only if the "evidence, taken in the light most favorable to the plaintiff, so clearly establishes contributory negligence that no other reasonable conclusion can be drawn therefrom." *Clary v. Alexander County Bd. of Educ.*, 286 N.C. 525, 532, 212 S.E. 2d 160, 165 (1975).

## A

[5] Defendants first contend that Olympic, as owner of the building in question, violated the Building Code in such a manner that it was contributorily negligent *per se*. The North Carolina Building Code requires that when an existing building is altered, "all portions thereof affected by such . . . alteration shall be strengthened, if necessary, so that all loads will be supported safely . . . ." N.C. Bldg. Code Sec. 1201.3 (1978). It is undisputed that addition of the new roof violated Section 1201.3 of the Building Code, since the additional weight on the building was not "supported safely" by the structure. Testimony from plaintiff's experts indicated that a steel column supporting part of the roof had been improperly constructed and did not meet the strength requirements of the Building Code even before the addition of the new roof. The evidence at trial also tended to show that the building was not strengthened to accommodate the weight of the new roof.

Defendants cite two cases to support their allegation that Olympic as owner was negligent *per se* in violating the Building Code. In *Jenkins v. Starrett Corp.*, 13 N.C. App. 437, 186 S.E. 2d 198 (1972), an owner of an ice merchandiser, who was in the business of vending ice, installed the ice merchandiser without properly grounding the machine, as required by the Building Code. The owner was subsequently held negligent *per se* when a user of the machine was shocked and injured as a result of the improper grounding. In *Federated Mut. Ins. Co. v. Hardin*, 67 N.C. App. 487, 313 S.E. 2d 801 (1984), this Court held that a building owner's

failure to obtain a building permit before adding a fireplace to his home constituted contributory negligence *per se* if it proximately caused his damage. In that case, both a local ordinance and the State Building Code required the permit before a person could proceed with the alteration of a building. The local ordinance specifically placed responsibility for obtaining the permit on the owner or his agent.

The Code does not precisely define the class of persons who must obey it. *Jenkins*, 13 N.C. App. at 445, 186 S.E. 2d at 203. However, as set out in Section 101.2, the purpose of the Building Code is to

> provide certain minimum standards, provisions and re-
> quirements for *safe and stable design, methods of construc-*
> *tion* and uses of materials in buildings and/or structures
> hereafter erected, constructed, enlarged, altered, repaired,
> moved, converted to other uses or demolished and to regu-
> late the equipment, maintenance, use and occupancy of all
> buildings and/or structures.

N.C. Bldg. Code Sec. 101.2 (1978) (emphasis added). Section 143-138(b) (1983) of the North Carolina General Statutes states that the Building Code Council may establish rules and regulations that are "reasonably necessary for the protection of the occupants of the building or structure, its neighbors, and members of the public at large." From the above emphasized language in Section 101.2 it is apparent that the Code applies to the design and construction of buildings that are altered. *See also Carolinas-Virginias Ass'n of Bldg. Owners and Managers v. Ingram*, 39 N.C. App. 688, 694-99, 251 S.E. 2d 910, 914-17 (Court held that amendments to Building Code could not be applied retroactively to existing buildings and found that Building Code regulates construction of buildings, not buildings themselves), *disc. rev. denied*, 297 N.C. 299, 254 S.E. 2d 925 (1979).

Section 101.6(e) of the Building Code provides:

> (e) *Maintenance*: All buildings or structures, both ex-
> isting and new, and all parts thereof, shall be maintained in a
> safe and sanitary condition. All devices or safeguards which
> are required by this code in a building when erected, altered,
> or repaired, shall be maintained in good working order. The

owner, or his designated agent, shall be responsible for the maintenance of buildings or structures.

While this section places responsibility for the maintenance of buildings on the owner or his designated agent, this section, standing alone, does not render an owner negligent *per se* for Code violations committed by independent contractors to whom it has delegated the performance of specific maintenance tasks.

We hold, therefore, that the Code imposes liability on any person who constructs, supervises construction, or designs a building or alteration thereto, and violates the Code such that the violation proximately causes injury or damage. In addition, if a building owner knows or has reason to know of a Building Code violation and fails to take reasonable steps to remedy the violation, he may be found liable if the violation proximately causes injury or damage. *Cf. Sink v. Andrews*, 81 N.C. App. 594, 344 S.E. 2d 831 (1986) (in wrongful death action, plaintiff's failure to show that former owners of house from whom she purchased house, had knowledge or reason to know of alleged Building Code violations entitled them to summary judgment on negligence issue). We do not address the issue of whether a contractor who constructs in accordance with plans provided to him by an owner is liable for Code violations which proximately cause injury or damage. We therefore inquire as to whether Olympic was negligent *per se* under the above principles through the doctrine of imputed contributory negligence, the defensive counterpart to respondeat superior. *Cf. Blanton v. Moses H. Cone Memorial Hosp., Inc.*, 319 N.C. 372, 374-75, 354 S.E. 2d 455, 457 (1987) (since a corporation can only act through its agents, if it is to be liable for negligence, it must be through the doctrine of respondeat superior).

1

[6] It is undisputed that Mize, Olympic's vice president in charge of engineering, selected machinery, contracted with builders for the construction of buildings, and handled major maintenance problems. The evidence tended to show that Mize hired Suarez for the design, inspection, and general supervision of the reroofing project and that Mize hired Roof Systems to apply the roof membrane. The contract between Roof Systems and Olympic provided that Roof Systems would also furnish supervision for the reroofing project. This evidence indicated that Mize delegated the

tasks of designing, constructing and supervising the application of
the new roof to others. The evidence also tended to show that
Mize delegated these activities because he did not feel qualified
to undertake the project and was overseeing construction of an-
other plant. When viewed in the light most favorable to Olympic,
the evidence was not sufficient to show that Mize designed, con-
structed or supervised the reroofing project. Rather than taking
an active role himself, he delegated the task to others. Further-
more, there was not sufficient evidence to show that Mize knew
or should have known of the structural inadequacy of the roof ei-
ther before or after the new roof was applied. In addition, the evi-
dence tended to show that Mize was at least implicitly assured by
Suarez that the load-bearing capacity of the roof was adequate for
the new roof and that he relied on Suarez's plans and specifica-
tions. Therefore, we conclude that the directed verdict was in er-
ror regarding Olympic's negligence through Mize.

2

[7]   Having found that Olympic was not negligent for violations
of the Building Code through the actions of Mize, we turn our
discussion to Suarez and the nature of his relationship with Olym-
pic. Olympic admits that Suarez may have been negligent but con-
tends that Suarez was an independent contractor and therefore
his negligence cannot be imputed to it. *Hendricks v. Leslie Faye,
Inc.*, 273 N.C. 59, 159 S.E. 2d 362 (1968). In order to hold Olympic
negligent under the doctrine of imputed contributory negligence,
the relationship of master and servant or principal and agent
must have existed between Olympic and Suarez at the time of,
and in respect to, the negligent act or acts which proximately
caused Olympic's damage. *Graham v. North Carolina Butane Gas
Co.*, 231 N.C. 680, 683-84, 58 S.E. 2d 757, 760 (1950).

At the outset, we note that the determination of whether a
person is an independent contractor or servant is a mixed ques-
tion of law and fact. *See Beach v. McLean*, 219 N.C. 521, 525, 14
S.E. 2d 515, 518 (1941). Where the evidence is conflicting or sus-
ceptible of more than one inference, it is a question of fact for the
jury. 57 C.J.S. *Master and Servant* Sec. 617 at 409 (1948); *see also
Robinson v. McAlhaney*, 214 N.C. 180, 183, 198 S.E. 647, 650
(1938). The issue is a question of law where there is no conflict in
the evidence and only one inference may be drawn from the facts.

57 C.J.S. *Master and Servant* Sec. 617 at 410; *Smock v. Brantley,* 76 N.C. App. 73, 75, 331 S.E. 2d 714, 716 (1985), *disc. rev. denied,* 315 N.C. 590, 341 S.E. 2d 30 (1986).

There are several factors that must be considered in determining whether one is a servant or an independent contractor. *See Hayes v. Board of Trustees of Elon College,* 224 N.C. 11, 16, 29 S.E. 2d 137, 140 (1944). The right to control the details of the work is one of the controlling principles in making this determination. *See Vaughn v. North Carolina Dept. of Human Resources,* 296 N.C. 683, 686, 252 S.E. 2d 792, 795 (1979). Additionally, one may be an independent contractor for some purposes and a servant for others. *See Hoffman v. Ryder Truck Lines, Inc.,* 306 N.C. 502, 506-08, 293 S.E. 2d 807, 810-11 (1982). In the case at bar, the evidence tended to show that Suarez was hired in at least two distinct capacities. He was first hired to draft the reroofing plans and to help procure bids for the project. He subsequently was hired to supervise and inspect the work of Roof Systems. From the evidence before us, we believe a jury could find that Olympic did not have the right to control the details of Suarez's work in either capacity.

The evidence also tended to show that Suarez was engaged in the independent business of a roofing consultant and was hired for his knowledge and experience in this area. The evidence also indicated that Suarez was paid a flat fee for drafting the plans but was paid by the hour for supervising and inspecting the re-roofing work. No deductions were made from his fees for taxes or employee benefits. Although Suarez was referred to as the owner's "representative" in the contract between Roof Systems and Olympic, this reference is not necessarily dispositive on the issue of whether a master-servant or principal-agent relationship existed. *Cf. Kesler Const. Co. v. Dixon Holding Corp.,* 207 N.C. 1, 5, 175 S.E. 843, 845 (1934) (rights of parties under a contract are not to be determined solely by what they call each other).

Defendants contend that Suarez's activities as a roofing consultant to Olympic should be analyzed in light of our decision in *Greensboro Hous. Auth. v. Kirkpatrick & Assocs.,* 56 N.C. App. 400, 289 S.E. 2d 115 (1982). In *Kirkpatrick,* this Court found that several architects in that case were agents of the owner, stating as a general rule that, " 'as regards the performance of his super-

visory functions with respect to a building under construction, [an architect] ordinarily acts as the agent and representative of the person for whom the work is being done.'" *Id.* at 402-03, 289 S.E. 2d at 117 (quoting 5 Am. Jur. 2d *Architects* Sec. 6 at 668 (1962)); *but cf.* 5 Am. Jur. 2d *Architects* Sec. 6 at 668 (architect acts as independent contractor in preparing plans). Defendants liken Suarez's activities in the present case to that of the architects in the *Kirkpatrick* case and contend that any negligence of Suarez should therefore be imputed to Olympic. However, we find the facts of the *Kirkpatrick* case distinguishable from our own. In *Kirkpatrick*, the owner not only stipulated that the architects were *its* agents, but the architects also had the power to enter into contracts on behalf of the owner and had considerable control over the construction project. In the case *sub judice*, there is no evidence of Suarez's power to enter contracts on behalf of Olympic nor is it clear as to the extent of his supervisory authority over Roof Systems. We reject the notion that an architect or roofing consultant supervising a construction project is conclusively an agent of the owner such that their negligence can be imputed to the owner in all circumstances. *See Cutlip v. Lucky Stores, Inc.*, 22 Md. App. 673, 677-82, 325 A. 2d 432, 435-37, *cert. denied*, 273 Md. 719 (1974).

There are factors indicating that Suarez was an independent contractor and others indicating he was a servant or agent of Olympic. Suarez may have been negligent in designing, supervising, and/or inspecting the reroofing project, or knew or had reason to know of the Building Code violations. However, in each activity, to hold Olympic liable for Suarez's negligence, Suarez must have been a servant or agent acting within the scope of his employment at the time of the negligent act(s) which proximately caused Olympic's damage.

Here, reasonable men could differ on the inferences to be drawn from the evidence on the question of whether Suarez was a servant or agent of Olympic in the reroofing project and whether his alleged negligence, while acting as a servant or agent, was a proximate cause of Olympic's damage. *See Rouse v. Jones*, 254 N.C. 575, 580, 119 S.E. 2d 628, 632 (1961) (proximate cause is ordinarily a question for the jury). Therefore, the directed verdict based on Olympic's negligence through Suarez was error.

B

[8]  Defendants further contend that Olympic was negligent in hiring and relying on Suarez as a roofing consultant instead of hiring a licensed structural engineer to check the building's structural adequacy. An employer may be found liable for failing to use due care in securing a competent contractor if the contractor is negligent and proximately causes injury or damage. *See Page v. Sloan*, 12 N.C. App. 433, 439, 183 S.E. 2d 813, 817 (1971), *aff'd*, 281 N.C. 697, 190 S.E. 2d 189 (1972).

Even assuming that Suarez was negligent, plaintiff's evidence indicated that Mize inquired into Suarez's qualifications to some extent. This inquiry revealed Suarez had degrees in architecture and engineering from the University of Havana and that Suarez was attempting to have his degrees recognized in the United States. Mize also consulted a plant engineer from another Cone Mills' location that had previously used Suarez to solve a roofing problem at that plant. In addition, Mize requested and obtained a list of other companies for which Suarez had worked.

This evidence was sufficient to show that Olympic's reliance on Suarez was reasonable given the investigation Mize made into Suarez's background as well as Suarez's work in drafting the re-roofing plans, procuring the bids, and helping draft the contract between Olympic and Roof Systems. As well, this evidence was sufficient to show that Olympic exercised due care in hiring Suarez. Therefore, the directed verdict against Olympic was not proper on these grounds.

C

[9]  Defendants also contend that Olympic was negligent for failing to follow general engineering principles in having its building reroofed. Plaintiff's expert witnesses testified that it was proper engineering practice to have a structural engineer investigate a building for structural weaknesses before making additions. However, as we have previously found, the evidence was sufficient to show that this duty, assuming there was one, was delegated to Suarez. Unless it can be shown that Suarez was acting as Olympic's servant or agent at the time of his alleged violations of engineering principles which proximately caused the collapse, these violations cannot be imputed to Olympic.

D

[10]   The trial court further found Olympic negligent as a matter of law, for failing to act to correct any negligence of Roof Systems when Olympic knew or should have known of the condition of the roof installation before the collapse. However, the evidence revealed that when Mize discovered the problem with the roof drains, he called Suarez to advise him of the situation and asked him to contact Roof Systems to have them send an employee to check on the drains. Suarez contacted Roof Systems but Roof Systems failed to cut the drains back as requested. Based on this evidence, it is clear that Mize acted to try and correct the problem and therefore the trial court's ruling was in error.

E

[11]   Defendant Carlisle argues that Olympic was under a nondelegable duty to ascertain whether its building would support the new roof because reroofing a building is intrinsically dangerous. *See Deitz v. Jackson*, 57 N.C. App. 275, 279-81, 291 S.E. 2d 282, 285-86 (1982). If Olympic was under a nondelegable duty to check the roof support, any negligence in failing to adequately determine the support would be imputed to Olympic, if it were a proximate cause of Olympic's damage, whether the negligence was on the part of a servant *or* independent contractor. *See Hendricks v. Leslie Faye, Inc.*, 273 N.C. 59, 159 S.E. 2d 362 (1968). However, our Supreme Court has found that the erection of a building is not "intrinsically dangerous" and does not fall within those activities considered nondelegable in nature. *Peters v. Carolina Cotton & Woolen Mills, Inc.*, 199 N.C. 753, 754, 155 S.E. 867, 868 (1930); *Vogh v. F. C. Geer Co.*, 171 N.C. 672, 676, 88 S.E. 874, 876 (1916); *see also Scales v. Lewellyn*, 172 N.C. 494, 90 S.E. 521 (1916) (raising of house by means of jacks and pulleys is not inherently dangerous). We similarly conclude that the reroofing of a building is not within the purview of "intrinsically dangerous" or "specially hazardous" work. Furthermore, we find no other grounds for a nondelegable duty on Olympic arising from the reroofing project.

IV

[12]   Having determined that the trial court committed error in granting defendants' motion for directed verdict, this case must

be remanded for a new trial. Since defendants seek to bar Olympic's recovery through the doctrine of imputed contributory negligence, some discussion of that doctrine is appropriate.

Where a party is injured by a servant the purpose of imputed negligence is to provide a remedy against the master for an injury caused by the servant's negligence. From this rule of vicarious liability on the part of a *defendant* master, the companion rule arose which imputes to the master the servant's negligence when the master is the *plaintiff* seeking to recover for his injuries from a third person, even though the master was not at fault. *See Rollison v. Hicks*, 233 N.C. 99, 104-06, 63 S.E. 2d 190, 194-95 (1951).

However, to apply the doctrine of imputed contributory negligence to allow one agent to impute the negligence of a fellow agent to bar the principal's recovery would subvert the reason for the rule of imputed negligence. Instead of granting a remedy where one should be allowed, it would extinguish one that already exists. It is well established that there can be more than one proximate cause of an injury and where two or more proximate causes combine to cause injury, the author of each may be held liable and an action may be maintained against any one author, or against all as joint tort-feasors. *Rouse v. Jones*, 254 N.C. 575, 581, 119 S.E. 2d 628, 633 (1961). Therefore, we conclude that when a principal is injured by the concurring negligence of two or more agents of the principal and the negligence of the agents concur to proximately cause injury or damage to the principal, the agents may not implead the negligence of each other to bar the principal's claim against them.

Therefore, on retrial, if it is found that Suarez and/or Mize were negligent in their capacities as servants or agents and their negligence was a proximate cause of Olympic's damage, it will be necessary to determine if the defendants were servants or agents of Olympic as well. If either defendant was an agent of Olympic and if either defendant's negligence concurred with the negligence of Suarez and/or Mize acting in their capacity as agents to cause Olympic damage, that defendant cannot impute the negligence of Suarez and/or Mize to bar Olympic's recovery. If either defendant is found to be an independent contractor, that defendant would not be barred from imputing the agent's negligence to Olympic.

Our holding is supported by other courts facing similar issues of imputed contributory negligence and agents. *See South Carolina Ins. Co. v. James C. Greene & Co.*, 290 S.C. 171, 348 S.E. 2d 617 (1986) (agent cannot impute contributory negligence of another agent to principal to bar principal's recovery when principal sued agent for negligent performance of his duties); *Buhl v. Viera*, 328 Mass. 201, 202, 102 N.E. 2d 774, 775 (1952) (fact that negligence of a servant of plaintiff contributed to a third person's injury was immaterial in master's action for indemnification against a fellow servant); *Patterson v. Brater*, 225 Mich. 297, 301, 196 N.W. 202, 203 (1923) (if defendant was guilty of negligence which was the proximate cause of the loss to master, negligence on part of other employees constitutes no defense to master's action for the negligence of defendant-employee); *Lutz Feed Co. v. Audet & Co.*, 337 N.Y.S. 2d 852, 72 Misc. 2d 28 (1972) (two agents acting for principal in the same matter may be held concurrently negligent and not bar master's action against them); *Oxford Shipping Co. v. New Hampshire Trading Corp.*, 697 F. 2d 1, 6-7 (1st Cir. 1982) (to allow agents to set up each other's breach of duty in effect prevents a principal's recovery where more than one agent defaults in his duty); *see also* cases cited in Annotation, *Imputation of Contributory Negligence of Servant or Agent to Master or Principal, In Action by Master or Principal Against Another Servant or Agent for Negligence in Connection with Duties*, 57 A.L.R. 3d 1226 (1974).

## V

The trial court allowed defendants' motions for directed verdict on the issue of last clear chance. Olympic contended that if it were negligent, it would not be barred in its claim against defendants because defendants had the last clear chance to avoid the building's collapse. However, since we have found that the directed verdicts on the issue of Olympic's contributory negligence were improperly granted, we need not address this issue. In addition, plaintiff brought forward other assignments of error which are unnecessary to our disposition of this case.

## VI

In conclusion, we find the trial court committed error in granting Carlisle's motion for a directed verdict on the issue of its negligence. The summary judgment motion in favor of Roof Sys-

tems on the issue of its wanton negligence is affirmed. We further find the trial court erred in granting a directed verdict on the issue of Olympic's contributory negligence. We therefore remand the case for a new trial.

Affirmed in part, reversed in part and remanded for a new trial.

Judges PHILLIPS and COZORT concur.