THE TRUSTEES OF ROWAN TECHNICAL COLLEGE v. J. HYATT HAMMOND ASSOCIATES, INC., WAGONER CONSTRUCTION CO., INC., WILFORD A. HAMMOND AND J. HYATT HAMMOND

No. 376PA84

(Filed 2 April 1985)

**1. Architects § 3; Limitation of Actions § 4.2; Professions and Occupations § 1— action against architects and engineers—applicable statute of repose**

Plaintiff's claim against defendant architects and engineers arising out of their design and supervision of improvements to realty was governed by the six-year statute of repose set forth in the 1963 version of G.S. 1-50(5), a statute dealing with claims against persons, among others, who design and supervise construction of buildings, rather than by the four-year statute of repose contained in the statute dealing with professional malpractice claims, G.S. 1-15(c). In enacting G.S. 1-15(c), the Legislature intended the statute to apply to malpractice claims against all professionals who are not dealt with more

specifically by some other statute, and the 1963 version of G.S. 1-50(5) is a statute specifically applicable to architects and builders and deals more particularly with the precise situation presented by plaintiff's claim.

**2. Architects § 3; Professions and Occupations § 1— faulty design or supervision by architects—applicability of statute of repose**

    G.S. 1-50(5) was intended to apply to all actions against architects, and others therein described, where plaintiff seeks damages resulting from the architect's faulty design or supervision, whether those damages are sought merely to correct the defect or as a result of some further injury caused by the defect. *Obiter dictum* in *Ports Authority v. Roofing Co.*, 294 N.C. 73 (1978), that the statute applies only when plaintiff alleges not merely the defective condition itself but also some injuries subsequent to and caused by the defective condition is disapproved.

    Justice MITCHELL took no part in the consideration or decision of this case.

ON discretionary review of an unpublished decision of the Court of Appeals, affirming in part and reversing in part orders entered by *Judge Wood* at the 7 September 1982 Civil Session of ROWAN County Superior Court.

*Williams, Boger, Grady, Davis & Tuttle, P.A., by Samuel F. Davis, Jr. for plaintiff appellant.*

*Womble, Carlyle, Sandridge & Rice by William C. Raper and Michael E. Ray for defendant appellees J. Hyatt Hammond Associates, Inc., Wilford A. Hammond and J. Hyatt Hammond.*

EXUM, Justice.

[1] The sole question presented by this appeal is whether the four-year statute of repose contained in N.C.G.S. § 1-15(c), a statute dealing with professional malpractice claims, operates to bar plaintiff's claim for damages against defendant architects and engineers. We conclude that it does not because N.C.G.S. § 1-50 (5), a statute dealing with claims against persons, among others, who design and supervise construction of buildings with a six-year statute of repose, governs this claim.[1] We, therefore, reverse the Court of Appeals which decided to the contrary.

Rowan Technical College is a community college located in Salisbury. Defendant J. Hyatt Hammond Associates, Inc. (Ham-

---

    1. All statutes of limitation or repose referred to in this opinion appear in Chapter 1 of the North Carolina General Statutes. All references to these statutes, therefore, will hereafter be simply by section number.

mond) is an architectural and engineering firm. Defendant Wilford A. Hammond, a licensed architect, and defendant J. Hyatt Hammond, a licensed engineer, are both officers, stockholders and employees of the firm. Defendant Wagoner Construction Company, Inc. (Wagoner) is a general contracting firm.

According to the complaint filed 26 April 1982, plaintiff on 6 December 1973 contracted in writing with Hammond for Hammond to provide architectural and engineering services in connection with the construction of three buildings and a teaching auditorium on plaintiff's campus. Hammond agreed under section 1-13(f) of the contract to "provide general administration of the performance of construction contracts," including continuous inspection of all work "by qualified and mutually agreed upon representatives of the designer's firm not less than once per week . . . and as often as necessary to insure compliance with plans and specifications." The parties entered a supplemental agreement in which, for further consideration paid by plaintiff, Hammond agreed "to provide daily and continuous supervision and inspection of the work." Following this agreement, plaintiff on 2 October 1974 contracted in writing with defendant Wagoner for the actual construction of the buildings. On 1 October 1976, Hammond certified to plaintiff that Wagoner had completed its construction contract. Plaintiff made final payment to Wagoner on 11 October 1976 based upon this certification, followed by final payment to Hammond on 27 April 1977.

The complaint further alleges: On or about 15 January 1982, plaintiff noticed a horizontal fracture and displacement between the first and second courses of concrete block in one of the buildings, creating an offset in the masonry joint and an outward bowing of the wall. Upon further inspection, plaintiff discovered similar fractures and displacements on exterior walls of each of the buildings designed by Hammond and constructed by Wagoner. These defects were not reasonably discoverable before 15 January 1982. Plaintiff suffered extensive and ongoing damage, requiring extensive repairs and replacement, proximately caused by breach of contract, breach of express and implied warranties and negligence by Hammond and Wagoner in failing to properly design and construct the buildings.

Hammond responded with a motion to dismiss under N.C.G.S. 1A-1, Rule 12(b)(6) alleging *inter alia* that plaintiff's claim was filed more than four years after it accrued and was therefore time barred by § 15(c) and § 52(1). Wagoner raised the same defense in an amended answer filed 20 September 1982.

The trial court granted Hammond's motion to dismiss on 17 September 1982 and Wagoner's on 7 October 1982.

On plaintiff's appeal the Court of Appeals reversed the dismissal as to Wagoner. The Court of Appeals held that plaintiff's claim against Wagoner was governed by § 52(16), which provides for a three-year period of limitation from the time "damage to property becomes apparent or ought reasonably to have become apparent, whichever first occurs." Since plaintiff discovered its damage on 15 January 1982 and brought its action within three years, plaintiff was not time barred.

The Court of Appeals affirmed the dismissal of plaintiff's claims against Hammond. It held this action was governed by § 15(c) with its "outside limit of four years [from defendant's last act] for an action for malpractice arising out of the performance or failure to perform professional services." Since plaintiff's claim was not filed until 26 April 1982, more than four years from Hammond's certification of the project, plaintiff's suit against Hammond was time barred.

We allowed plaintiff's petition for discretionary review "with review limited solely to the question of which statute . . . applies to . . . plaintiff's claim against . . . defendant architects and engineers."

I.

At the outset we note that the present version of § 50(5), as amended effective 1 October 1981 (1981 Sess. Laws, c. 644), does not apply to this claim. Both parties concede that had plaintiff's claim accrued after the effective date of the 1981 amendments to § 50(5), it would be governed by the six-year statute of repose contained therein.[2] Plaintiff's claim accrued, however, before the

_____

2. This statute, as amended, expressly applies to "actions to recover damages for breach of a contract to construct or repair an improvement to real property," § 50(5)(b)(1), "actions to recover damages for the negligent construction or repair

effective date of this statute. If plaintiff's claim was already barred when amended § 50(5) became effective, it could not be revived by the amendments. *Raftery v. Construction Co.*, 291 N.C. 180, 230 S.E. 2d 405 (1976).

The question, then, is whether plaintiff's claim was barred before the amendments to § 50(5) became effective. The answer depends upon whether plaintiff's claim is governed by § 15(c) as Hammond contends, or the 1963 version of § 50(5) as plaintiff contends.[3] If the former governs, plaintiff's claim would be barred because that statute contains a four-year statute of repose running from Hammond's last act giving rise to the claim. The parties apparently agree that Hammond's last act giving rise to the claim occurred no later than 1 October 1976, the date Hammond certified that the general contractor had completed construction. If § 50(5) applies, plaintiff's claim would not be barred since this statute contains a six-year statute of repose running from "performance or furnishing of . . . services and construction." If Hammond completed its architectural and engineering services no earlier than 1 October 1976, the date of its certification, plaintiff's claim was filed within the time period prescribed by this statute.[4]

---

of an improvement to real property," § 50(5)(b)(2), and "actions against any person furnishing materials, or . . . who performs or furnishes the design, plans, specifications, surveying, supervision, testing or observation of construction, or construction of an improvement to real property, or a repair to an improvement to real property," § 50(5)(b)(9), to the express exclusion of § 15(c). § 50(5)(g).

3. Both the four-year limitation period in § 15(c) and the six-year limitation period in § 50(5) constitute statutes of repose, rather than statutes of limitation. In *Lamb v. Wedgewood*, 308 N.C. 419, 302 S.E. 2d 868 (1983), this Court explained the distinction. Statutes of limitation are generally seen as running from the time of injury, or discovery of the injury in cases where that is difficult to detect. They serve to limit the time within which an action may be commenced after the cause of action has accrued. Statutes of repose, on the other hand, create time limitations which are not measured from the date of injury. These time limitations often run from defendant's last act giving rise to the claim or from substantial completion of some service rendered by defendant. The four- and six-year time limitations of § 15(c) and § 50(5) run not from date of injury or accrual, but from the last act of defendant in the case of § 15(c) and from completion of some service or construction in the case of § 50(5).

4. It is unclear from the record and the parties' briefs when they contend defendant's last act giving rise to the claim occurred, for purposes of § 15(c), or when defendant last furnished or performed services, for purposes of § 50(5). Some suggestion is made by plaintiff that construction was completed on 11 October 1976 and that this date is the critical one for both statutes. However, as we understand

The Court of Appeals erroneously concluded plaintiff's claim was governed by § 15(c).

That section provides:

> Except where otherwise provided by statute, a cause of action for malpractice arising out of the performance of or failure to perform professional services shall be deemed to accrue at the time of the occurrence of the last act of the defendant giving rise to the cause of action: Provided that whenever there is bodily injury to the person, economic or monetary loss, or a defect in or damage to property which originates under circumstances making the injury, loss, defect or damage not readily apparent to the claimant at the time of its origin, and the injury, loss, defect or damage is discovered or should reasonably be discovered by the claimant two or more years after the occurrence of the last act of the defendant giving rise to the cause of action, suit must be commenced within one year from the date discovery is made: Provided nothing herein shall be construed to reduce the statute of limitation in any such case below three years. Provided further, that in no event shall an action be commenced more than four years from the last act of the defendant giving rise to the cause of action. . . .[5]

This section was enacted on 12 May 1976. (1975 N.C. Sess. Laws, c. 977.) It was designed to change "the time of accrual" of professional malpractice actions "from the date of discovery of injury to the date of defendant's last act" giving rise to the claim. *Flippin v. Jarrell*, 301 N.C. 108, 112, 270 S.E. 2d 482, 485 (1980). "Also, for latent claims discovered two or more years after the defendant's last negligent act, except those involving a non-therapeutic and non-diagnostic 'foreign object' left in the body,

---

the briefs, both parties apparently concede that on 1 October 1976, defendant certified to plaintiff that Wagoner Construction Company had completed construction and that this is the critical date for purposes of § 50(5). This fact appears in plaintiff's statement of facts and is not disputed by defendant's brief.

5. Neither party apparently disputes that the damage to plaintiff's building was a "defect in or damage to property which originate[d] under circumstances making the . . . defect not readily apparent to the claimant." Thus, there is no contention that a limitation period shorter than the four-year period of this statute applies to plaintiff's claim.

the statute established a four-year period of limitation" measured from defendant's last act. *Id.*

A review of this statute's legislative history reveals that it was enacted specifically in response to a so-called *medical malpractice* "crisis" experienced by North Carolina and many of her sister states. The Court of Appeals in *Roberts v. Durham County Hospital Corp.*, 56 N.C. App. 533, 540-41, 289 S.E. 2d 875, 879-80 (1982), provided the following analysis of the factors prompting the enactment of § 15(c):

> It is generally agreed that in the early 1970's what has been termed a medical malpractice insurance crisis existed in most jurisdictions in this country. The crisis resulted from the increasing reluctance of insurance companies to write medical malpractice insurance policies and the dramatic rise in premiums demanded by those companies which continued to issue policies. The difficulty in obtaining insurance at reasonable rates forced many health-care providers to curtail or cease to render their services. The legislative response to this crisis sought to reduce the cost of medical malpractice insurance and to insure its continued availability to the providers of health care. By October 1975, 39 states had commissioned studies of the medical malpractice problem and 22 states had revised civil practice laws and rules in an attempt to remedy the problem. Redish, Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications, 55 Tex. L. Rev. 759, 761 n. 14 (1977); see generally, American Bar Association, Report of the Commission on Medical Professional Liability (1977).

> In North Carolina, the Report of the North Carolina Professional Liability Insurance Study Commission (1976), analyzed the malpractice crisis in this state. The commission found that nationwide the number of malpractice suits increased by 70% from 1973 to 1974 and that this malpractice dilemma began to surface in North Carolina in 1974. The St. Paul Fire and Marine Insurance Company, which at that time insured over 90% of the physicians and surgeons practicing in this state as well as 75 hospitals, requested an 82.03% increase in its malpractice rates and threatened to withdraw from the state if the increase was not granted. Shortly

thereafter, St. Paul requested another premium rate increase and a change in policy form from 'occurrence' to 'claims made' and in September 1975 decided to cease offering coverage in North Carolina. After much negotiation a compromise was reached between the Commissioner of Insurance and St. Paul, so they again began offering coverage in North Carolina. *Id.* at 4-16. The bulk of the rate increases by St. Paul was for reserves for claims that were 'incurred but not reported.' *Id.* at 7. Reports of curtailments in health care services by some doctors and a few hospitals in the state were received by the Study Commission as it began to explore ways to increase the availability of insurance. *Id.* at 12. The Study Commission recommended lowering the outside time limit to four years for actions based on professional malpractice, including the foreign object cases. During the four year period, it advised allowing only one year from the date of discovery in which to bring an action. *Id.* at 28. The legislature responded by enacting N.C. Gen. Stat. § 1-15(c).

The legislative purpose to be served by this statute as it relates to these defendants is clear. This statute was passed by the General Assembly in an attempt to preserve medical treatment and control malpractice insurance costs, both of which were threatened by the increasing number of malpractice claims.[6]

Defendant Hammond concedes that this statute, originally proposed by the North Carolina Professional Liability Study Commission (Study Commission), was enacted primarily to deal with malpractice problems in the health care field. However, Hammond also argues that the Study Commission's original draft of § 15(c) referred expressly to "health care providers." When some members of the Study Commission objected that this designation was too narrow, the Study Commission changed it to read "professional malpractice."[7] The statute as enacted does not provide a defini-

---

6. The Court of Appeals noted that many other states in response to this crisis enacted statutes similar to § 15(c). For cases upholding such statutes, see *Roberts v. Durham County Hospital Corp.*, 56 N.C. App. at 541.

7. See Report of the North Carolina Professional Liability Insurance Study Commission, dated 12 March 1976, and the minutes of that Commission, dated 6 November 1975 and 23 January 1971.

tion of "professional." Hammond argues nonetheless that both the Study Commission and the legislature intended for claims against all "professionals" based on negligence to fall within § 15(c).

Section 15(c) is broad enough to encompass professionals other than those in health care. We do not, however, read the statute to mean that all persons who arguably may be labeled "professionals" necessarily fall within its ambit. All we gather from the actions of the Study Commission is that it wanted the statute to include some, but not necessarily all, professionals other than "health care providers." The legislature, we believe, intended the statute to apply to malpractice claims against all professionals who are not dealt with more specifically by some other statute.

Where one of two statutes might apply to the same situation, the statute which deals more directly and specifically with the situation controls over the statute of more general applicability. *National Food Stores v. North Carolina Board of Alcoholic Control*, 268 N.C. 624, 151 S.E. 2d 582 (1966); *State ex rel. Utilities Comm. v. Union Electric Membership Corp.*, 3 N.C. App. 309, 164 S.E. 2d 889 (1968). "When two statutes apparently overlap, it is well established that the statute special and particular shall control over the statute general in nature, even if the general statute is more recent, unless it clearly appears that the legislature intended the general statute to control." *Seders v. Powell*, 298 N.C. 453, 459, 259 S.E. 2d 544, 549 (1979); *Colonial Pipeline Co. v. Neill*, 296 N.C. 503, 251 S.E. 2d 457 (1979).

II.

Plaintiff contends, and we agree, that the 1963 version of § 50(5) is a statute specifically applicable to architects and others who plan, design or supervise construction, or who construct improvements to real property; therefore it and not § 15(c) should govern this claim.

The 1963 version of § 50(5) provides in pertinent part:

> No action to recover damages for any injury to property, real or personal, or for an injury to the person, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any

action for contribution or indemnity for damages sustained on account of such injury, shall be brought against any person performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property, more than six (6) years after the performance or furnishing of such services and construction.

Hammond argues that as between § 15(c) and § 50(5) the former is the more specific statute because it deals with "malpractice," which can only be alleged against a "professional," while § 50(5) may be applied generally to anyone making improvements to real property, not just to professionals performing a specialized service.

We disagree. Section 15(c) speaks generally of a "cause of action for malpractice arising out of the performance or failure to perform professional services." This statute defines the time of accrual and sets outer time limits for bringing malpractice claims in general. Section 50(5), by contrast, speaks specifically of "actions . . . for injury to property . . . arising out of the defective and unsafe condition of an improvement to real property brought against any person performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property." Because it deals expressly with claims arising out of defects in improvement to realty caused by the performance of specialized services of designers and builders, § 50(5) is, in essence, an architect's and builder's malpractice statute. In this sense it is a statute "special and particular," *Seders v. Powell*, 298 N.C. 453, 259 S.E. 2d 544, rather than a general malpractice statute like §15(c). Because this statute deals more particularly with the precise situation presented by plaintiff's claim, we hold that it, and not § 15(c), governs the claim.

Our analysis is bolstered by the present version of § 50(5). That section deals with actions for damages for breach of contract, negligence, and recovery of economic or monetary loss in general arising from faulty repair or improvement to real property against, among others, persons who furnish the design for or supervise the construction of such repair or improvement; and it does so to the express exclusion of § 15(c). While this version of § 50(5) does not apply to plaintiff's claim, we find it instructive in ascertaining the legislative intent embodied in the 1963 version.

When the legislature amends a statute, a presumption arises that its intent was either to (1) change the substance of the original act or (2) clarify the meaning of it. *Childers v. Parker's, Inc.*, 274 N.C. 256, 162 S.E. 2d 481 (1968). Where the legislature amends an ambiguous statute, no presumption arises that its intent was to change the substance of the original act. *Id.* Rather, the purpose of the amendment may be merely to "improve the diction, or to clarify that which was previously doubtful." *Id.* at 260, 162 S.E. 2d at 484.

We believe the 1981 amendments to § 50(5) were intended to clarify "that which was previously doubtful." The present case stands as an example of the ambiguity present in the 1963 version of § 50(5). The 1981 amendment made clear that § 50(5), and not § 15(c), is designed to govern malpractice claims against architects and builders. We believe the legislature intended this amendment to clarify the proposition that §15(c) was never intended to govern malpractice claims against architects arising out of their design and supervision of improvements to realty.

Our decision is further bolstered by the fact that § 50(5) was enacted, like many similar statutes across the country, at the urging of architects and builders in order to protect them against claims arising long after their work had been accomplished. A full discussion of this point with supporting authorities appears in *Lamb v. Wedgewood South Corp.*, 308 N.C. at 426-28, 302 S.E. 2d at 873. It would be anomalous, indeed, to permit defendant architects to avoid the very statute which their profession sought for its own protection when in a particular case the statute permits a claim to proceed because it was filed within the statute's time limitation.

Finally, we note that the 1963 version of § 50(5) was applied by this Court to a claim against architects in *Lamb v. Wedgewood*, 308 N.C. 419, 302 S.E. 2d 868 (1983). Hammond contends that *Lamb* does not stand as precedent for doing the same here because § 15(c) was not in effect when *Lamb* was decided. Thus, the *Lamb* Court was not confronted with a choice between it and § 50(5). We believe *Lamb* does represent valid authority for applying the six-year limitation period of § 50(5) to malpractice claims against architects. We are persuaded that the historical backdrop against which both § 15(c) and § 50(5) were

enacted would have led this Court to hold the latter applicable to plaintiff's claim in *Lamb* even if § 15(c) had then been in effect.

### III.

[2]  Finally, Hammond contends that even if the 1963 version of § 50(5) ordinarily applies to malpractice claims against architects and engineers, it is not applicable to this case because of the nature of the defects complained of. Hammond relies on *North Carolina State Ports Authority v. Frye Roofing Co.*, 294 N.C. 73, 240 S.E. 2d 345 (1978), for this contention. There, plaintiff sued a general contractor for breach of its contract to construct a warehouse and a transit shed. Plaintiff alleged that the roof of both buildings leaked following completion of the construction. Defendant admitted the roofs were built under its supervision and control but contended that the action was barred by the three-year statute of limitations in § 52. The trial court granted defendant's motion to dismiss upon this ground. The Court of Appeals, applying § 15(b) to the claim, reversed, but rejected plaintiff's contention that the six-year time limitation in § 50(5) applied.

On appeal, this Court affirmed. It held that

> . . . the six-year statute . . . contained in G.S. 1-50(5) has no application to this section. That statute applies to an action 'to recover damages for any injury to property, real or personal . . . arising out of the defective and unsafe condition of an improvement to real property.' The complaint does not allege, and nothing in the record before us indicates, any injury to property arising out of 'defective and unsafe conditions' of the roofs in question. It does not apply to an action, such as this, for a simple breach, by defective performance, of a contract to construct an improvement on real property.

*Id.* at 87, 240 S.E. 2d at 353. Hammond contends that under this language, § 50(5) applies only when plaintiff alleges not merely the defective condition itself but also some injury "subsequent to and caused by" the defective condition. Hammond argues that in alleging faulty design services resulting in fractures, masonry displacement and bowed walls, plaintiff has merely alleged the defective condition and not any injury "subsequent to and caused by it."

Hammond points to *Lamb v. Wedgewood*, 308 N.C. 419, 302 S.E. 2d 868 (1983), as an example of the type of case to which § 50(5) would apply. There, plaintiff, a guest at the Greensboro Hilton Inn, fell through an allegedly defective glass window near the sixth floor elevator and was killed. Hammond here contends that only this sort of injury "subsequent to and caused by" the defective improvement, rather than a claim for damages to repair the defect, falls within the ambit of § 50(5).

We disagree with this contention. Language in an opinion not necessary to the decision is *obiter dictum* and later decisions are not bound thereby. *Muncie v. Travelers Insurance Co.*, 253 N.C. 74, 116 S.E. 2d 474 (1960); *Washburn v. Washburn*, 234 N.C. 370, 67 S.E. 2d 264 (1951); *State ex rel. Utilities Comm. v. Central Telephone Co.*, 60 N.C. App. 393, 299 S.E. 2d 264 (1983). The Court's discussion of § 50(5) in *Ports Authority* was not central to its decision. There defendant contractor finished the building in the summer of 1968, and plaintiff filed suit on 7 August 1973. Plaintiff's breach of contract claim would have been barred by the three-year statute of limitations in § 52(1) if the claim accrued when the work was completed. The Court concluded, however, that plaintiff's action was not necessarily barred, relying not on § 50(5) as plaintiff urged, but on § 15(b) which changed the time of accrual of a cause of action in latent "injury, defect, or damage" cases from defendant's last act to the time the "injury" was or reasonably should have been discovered. The Court held that plaintiff was entitled to show that its claim was based on a latent defect as defined by § 15(b), discovered within three years of filing claim, and affirmed the Court of Appeals' reversal of summary judgment for defendant. Since the Court was able to afford plaintiff the relief it sought by applying §15(b), and did so, its discussion of § 50(5) was unnecessary to the decision and is *obiter dictum*.

We also believe that for the purpose of applying statutes of limitations and repose, the distinction made in the *Ports Authority* dictum between damages for repairs or for diminution in value caused by a defective or unsafe condition in real property improvements, and damages "subsequent to and caused by" such defects, is not well founded. We here reject it. We hold § 50(5) was intended to apply to all actions against architects, and others therein described, where plaintiff seeks damages resulting from

the architect's faulty design or supervision, whether those damages are sought merely to correct the defect or as a result of some further injury caused by the defect.

The decision of the Court of Appeals is reversed and the case remanded for proceedings consistent with this opinion.

Reversed and remanded.

Justice MITCHELL took no part in the consideration or decision of this case.