CYRIL Z. CACHA, AND WIFE, RENATA CACHA, PLAINTIFFS v. MONTACO, INC.,
AMERICAN DRYWALL COMPANY, AND DRYVIT SYSTEMS, INC., DEFENDANTS

No. COA00-374

(Filed 6 November 2001)

### 1. Products Liability— statute of repose—synthetic stucco— first purchase for use or consumption

Plaintiffs' claims against a synthetic stucco (EIFS) manufacturer were barred by the 6 year products liability statute of repose, N.C.G.S. § 1-50(a)(6), where the subcontractor purchased the EIFS in April of 1991, plaintiffs purchased their house on 2 October 1992; and plaintiffs filed their action on 19 August 1998. The EIFS was first "purchased for use or consumption" by the subcontractor because it was "consumed" when it was applied; that is, when its use resulted in its transformation and the destruction of its original form so that it could not be returned to its original consistency and used on another house. Moreover, the ultimate use of the EIFS was to provide a weather-resistant barrier, which it began to do the moment it was applied.

### 2. Products Liability— statute of repose—synthetic stucco— not tolled by class action

The N.C.G.S. § 1-50(a)(6) statute of repose was not tolled by the filing of a class action in a synthetic stucco action. Under *Monson v. Paramount Homes, Inc.*, 133 N.C. 235, statutes of repose may not be tolled by considerations of equity. Other cases cited involved statutes of limitation rather than of repose or the defeat of a statute of repose rather than tolling.

### 3. Real Property— improvements—statute of repose—synthetic stucco—willful and wanton negligence exception

The trial court did not err by granting summary judgment for a builder and subcontractor in a synthetic stucco action where plaintiffs' claims were barred unless falling within the willful and wanton negligence exception to the N.C.G.S. § 1-50(a)(5) real property improvements statute of repose. The essentially uncontradicted evidence was to the effect that neither defendant had any knowledge that their conduct would cause damage to the residence; even if the evidence arguably reflected negligence, it fell short of showing a wicked purpose or the intentional disregard of and indifference to the rights and safety of others.

Judge HUDSON concurring in part and dissenting in part.

CACHA v. MONTACO, INC.

[147 N.C. App. 21 (2001)]

Appeal by plaintiffs from order entered 2 December 1999 by Judge Gregory A. Weeks in Wake County Superior Court. Heard in the Court of Appeals 22 January 2001.

*Lewis & Roberts, P.L.L.C., by Daniel K. Bryson and F. Murphy Averitt, III, for plaintiff-appellants.*

*Pinto Coates Kyre & Brown, PLLC, by Kenneth Kyre, Jr. and Brady A. Yntema, for defendant-appellee Montaco, Inc.*

*Hill, Evans, Duncan, Jordan & Davis, by Joseph P. Gram, for defendant-appellee American Drywall Company.*

*Womble Carlyle Sandridge & Rice, PLLC, by Jerry S. Alvis, Mary S. Pollard, Charles L. Becker, Robert E. Fields, III, and Scott P. Mebane, for defendant-appellee Dryvit Systems, Inc.*

JOHN, Judge.

Plaintiffs appeal the trial court's 2 December 1999 entry of summary judgment in favor of defendants. We affirm.

The instant action arises out of defendant Montaco, Inc.'s ("Montaco"), construction and sale of a house clad with an exterior insulation and finish system ("EIFS") known as synthetic stucco. Montaco began work on the residence in 1990 and retained defendant American Drywall Company ("American Drywall") as a subcontractor to install the EIFS. American Drywall purchased the EIFS from defendant Dryvit Systems, Inc. ("Dryvit"), a manufacturer and distributor of the EIFS product, and the system was installed in 1991. Construction of the home was completed and a certificate of occupancy was issued 21 September 1991 by the Town of Cary.

On 2 October 1992, plaintiffs Cyril Z. and Renata Cacha purchased the house from Montaco (the closing). In April 1996, plaintiffs became concerned that the residence was experiencing "severe and serious moisture intrusion problems" due to "inadequate and improper installation and application" of the EIFS.

In January 1996, a purported class action, *Ruff v. Parex*, 96-CVS-0059, was filed in New Hanover County Superior Court against various EIFS manufacturers, including Dryvit, asserting claims essentially identical to those alleged by plaintiffs against Dryvit herein. *Ruff v. Parex* was later certified as a class action and plaintiffs were designated class members. On 29 June 1999, plaintiffs opted out of the *Ruff v. Parex* class action, *see Crow v. Citicorp*

CACHA v. MONTACO, INC.

[147 N.C. App. 21 (2001)]

*Acceptance Co.*, 319 N.C. 274, 284, 354 S.E.2d 459, 466 (1987) (class members may be "given an opportunity to request exclusion from the class within a specified time"), and filed the present action 19 August 1998 to pursue their claims on an individual basis.

American Drywall, Montaco and Dryvit moved for summary judgment herein on 28 May, 27 September and 29 September 1999, respectively. Plaintiffs subsequently filed an amended complaint. On 2 December 1999, the trial court entered an order granting each defendant's summary judgment motion. Plaintiffs appeal.

In the case *sub judice*, plaintiffs advance three separate contentions in maintaining the trial court erred by granting defendants' summary judgment motions. First, plaintiffs argue their claims against Dryvit were filed within six years of the "first purchase for use for consumption" of the residence, and thus complied with the products liability statute of repose, *see* N.C.G.S. § 1-50(a)(6) (1999). Alternatively, plaintiffs maintain the statute of repose was tolled with respect to their claims against Dryvit by the filing of *Ruff v. Parex* in 1996. Finally, relying upon G.S. § 1-50(a)(5)(e), an exception to the real property statute of repose, *see* G.S. § 1-50(a)(5)(a), plaintiffs contend a jury question existed as to whether the alleged actions of Montaco and American Drywall constituted willful and wanton negligence. We consider plaintiffs' arguments *ad seriatim*.

[1] Regarding plaintiffs' claims against Dryvit, we note initially the undisputed circumstances that Dryvit was a remote manufacturer and that the EIFS made its way to plaintiffs' home through the commerce stream, thus implicating the products liability statute of repose, G.S. § 1-50(a)(6). *See Forsyth Memorial Hospital v. Armstrong World Industries*, 336 N.C. 438, 445, 444 S.E.2d 423, 427 (1994) (products liability statute of repose, as opposed to real property statute of repose, G.S. § 1-50(5)(b)(9), applies to remote manufacturer whose materials find their way to job site indirectly through the commerce stream; such manufacturer would not be a materialman who furnished materials to the job site under G.S. § 1-50(a)(5)(b)(9)).

We therefore apply the products liability statute of repose, G.S. § 1-50(a)(6), which provides as follows:

No action for the recovery of damages . . . based upon or arising out of any alleged defect or any failure in relation to a product

shall be brought more than six years after the date of *initial purchase for use or consumption.*

"Initial purchase for use or consumption" is not defined by statute.

Our Supreme Court has explained that:

[i]n construing this language, the normal rules of statutory construction apply: the intent of the legislature controls; words in a statute are normally given their natural and recognized meanings; and the statute will be interpreted so as to avoid absurd consequences.

*Tetterton v. Long Manufacturing Co.*, 314 N.C. 44, 55, 332 S.E.2d 67, 73 (1985) (citing *Sheffield v. Consolidated Foods Corp.*, 302 N.C. 403, 276 S.E.2d 422 (1981)). Further,

the obvious intent of the legislature . . . was to limit . . . the manufacturer's [] liability after a certain period of years had elapsed from the date of initial purchase for use or consumption. "Initial" is defined . . . to mean "of or relating to the beginning: marking the commencement: incipient, first."

*Id.* at 56, 332 S.E.2d at 74 (citations omitted). "Use" is defined as the act of using; the application or employment of something for some purpose." American Heritage Dictionary, 2nd College Edition. 1331 (1985). "Consumption" is defined as "the utilization of economic goods in the satisfaction of wants or in the process of production resulting chiefly in their destruction, deterioration, or transformation." *Id.* at 179.

In maintaining the instant claims against manufacturer Dryvit were brought within the limitation period proscribed by G.S. § 1-50(a)(6), plaintiffs note their complaint including the claims against Dryvit was filed 19 August 1998, less than six years after 2 October 1992. According to plaintiffs, 2 October 1992 qualifies as the "date of initial purchase for use or consumption" of the EIFS under G.S. § 1-50(a)(6). In support of this assertion, plaintiffs rely upon *Chicopee, Inc. v. Sims Metal Works, Inc.*, 98 N.C. App. 423, 391 S.E.2d 211 (1990), and *Tetterton.*

In *Chicopee*, the plaintiff textile manufacturer contracted with defendant American Tool and Machine Company (American Tool) to manufacture and install two drying ranges which incorporated allegedly defective pressure vessels. *Id.* at 424, 391 S.E.2d at 212. The ranges were used in the plaintiff's manufacture of fiber products.

CACHA v. MONTACO, INC.

[147 N.C. App. 21 (2001)]

*Id.* American Tool had subcontracted with defendant Sims Metal Works, Inc. to manufacture the pressure vessels. *Id.* at 425, 391 S.E.2d at 212.

This Court held American Tool's "use" of the pressure vessels was limited to installing them with other component parts into the drying ranges delivered to Chicopee's plant. *Id.* at 428, 391 S.E.2d at 214. We explained that:

> American Tool's purchase of the component parts for the purpose of assembly into a drying range . . . [wa]s not the "initial purchase for use" with the meaning of N.C. Gen. Stat. § 1-50(a)(6). [Rather,] Chicopee's purchase of the drying ranges for the purpose of manufacturing textiles was the "initial purchase for use" because manufacturing textiles was the ultimate or intended use of this product.

*Id.*

Based on the foregoing, plaintiffs reason that the closing "represents the first time the [EIFS] was purchased for its ultimate intended use as a cladding on the residence." Until that time, plaintiffs maintain, the EIFS was merely a component part of the structure having no independent value. Plaintiffs also emphasize that this Court cited with approval in *Chicopee* a Nebraska decision holding that

> [u]nder Nebraska statute of repose, plumbing pipe was first sold for use when homeowner took possession of house of which pipe was a part, not when plumbing subcontractor purchased pipe from pipe manufacturer.

*Id.* (citing *Witherspoon v. Sides Construction Co.*, 219 Neb. 117, 362 N.W.2d 35 (1985).

*Tetterton* involved a products liability action arising out of the 1981 death of plaintiff's intestate while operating a tobacco harvester. *Tetterton*, 314 N.C. at 46, 332 S.E.2d at 68. The harvester had been sold by defendant Long Manufacturing Co. to a dealer in 1974; in 1975, the dealer sold it to a farmer who thereafter sold it to defendant Revels Tractor Company, Inc. ("Revels"), in 1981; finally, Revels sold the tractor to plaintiff's intestate that same year. *Id.* Our Supreme Court ruled that "[t]he first purchase in this case 'for use or consumption' was by [the] farmer []" in 1975. *Id.* at 56, 332 S.E.2d at 74,

Based upon *Tetterton*, plaintiffs argue the statute of repose does not begin to run until a product is purchased by its ultimate con-

CACHA v. MONTACO, INC.

[147 N.C. App. 21 (2001)]

sumer. As applied to the case *sub judice*, plaintiffs contend the 2 October 1992 closing constituted the date upon which the EIFS was purchased for its ultimate intended use as a cladding on the residence. Therefore, plaintiffs continue, the intermediary purchase of the EIFS by American Drywall was not a "purchase for use or consumption" under G.S. § 1-50(a)(6) and plaintiffs are the "ultimate" consumer of the EIFS. *Chicopee*, 98 N.C. App. at 428, 391 S.E.2d at 214.

Dryvit likewise considers G.S. § 1-50(a)(6) the applicable statute of repose. However, Dryvit contends the statute began to run when the EIFS was purchased for its intended use or function, *i.e.*, installation on a residence for the purpose of providing a weather-resistant barrier protecting the interior of the structure from the elements. According to Dryvit, that event occurred in April 1991 when American Drywall first purchased the EIFS for installation in plaintiffs' residence and not at the closing. According to Dryvit, therefore, plaintiffs' claims against it, filed more than seven years later in 1998, were barred by the six year limitation set out in G.S. § 1-50(a)(6).

Applying the rules of statutory interpretation and the definitions cited above, we conclude that both *Chicopee* and *Tetterton* are distinguishable from the circumstances *sub judice* and that Dryvit's argument has merit. In *Chicopee*, the pressure vessel was not "purchased for use or consumption," G.S. § 1-50(a)(6), until the drying ranges were placed into service by the plaintiff, the ultimate consumer. *Chicopee*, 98 N.C. App. at 428, 391 S.E.2d at 214. In *Tetterton*, "[t]he first purchase [of the tobacco harvester] 'for use or consumption' was by [the] farmer," *id.* at 56, 332 S.E.2d at 74, also the ultimate consumer.

In the instant case, however, the EIFS was first "purchased for use or consumption," G.S. § 1-50a)(6), by American Drywall to be applied to plaintiffs' residence. Once American Drywall applied the EIFS, it was "consumed," *see id.*, that is, utilized in the construction process, which use resulted in its transformation, *see Websters* at 179, and the destruction of its original form, *see id.* At that point, the EIFS could not be returned to its original consistency and could not be deployed in the construction of another house.

In addition, as Dryvit maintains, the "ultimate and intended use" of the EIFS was to provide a weather-resistant barrier to protect the house interior from exposure to the weather. The EIFS at issue began to perform this function from the moment of application, becoming

CACHA v. MONTACO, INC.

[147 N.C. App. 21 (2001)]

immediately exposed to rain, wind and other elements, and thus subject to wear and tear and "deterioration," *see id.*

In short, the statute of repose was triggered in April 1991 upon the purchase by American Drywall of the EIFS for installation in plaintiffs' house, and plaintiffs' claims against Dryvit, the EIFS manufacturer, filed more than seven years later, were barred. *See* G.S. § 1-50(a)(6).

[2] Notwithstanding, plaintiffs maintain in the alternative that the statute of repose regarding their claims against Dryvit was in any event equitably tolled by the filing of *Ruff v. Parex* in 1996. Plaintiffs argue that their "rights [against Dryvit] were bound up in the class action until they opted out" on 16 July 1999, that the claims asserted against Dryvit in *Ruff* by the class were essentially the same as those asserted by plaintiffs against Dryvit herein, and that "the statute of repose should be tolled" for the period during which plaintiffs remained in *Ruff.* We are compelled to hold that the statute of repose may not be tolled by considerations of equity.

Plaintiffs rely upon *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 38 L. Ed. 2d 713 (1974). In that case, the United States Supreme Court held that commencement of a class action suspended the applicable statute of limitations for all putative class members. *Id.* at 561, 38 L. Ed. 2d at 731. Although the federal district court had denied class certification, therefore,

> the commencement of the original class suit toll[ed] the running of the statute [of limitations] for all purported members of the class who ma[d]e timely motions to intervene after the court ha[d] found the suit inappropriate for class action status.

*Id.* at 552-53, 38 L. Ed. 2d at 726. The statute of repose did not figure in the *American Pipe* decision.

According to plaintiffs, however, *American Pipe* should be extended to apply to statutes of repose as well as statutes of limitation. Otherwise, plaintiffs insist,

> every putative member of the *Ruff* class would, at some point, have their claims barred by statute of repose, even though their class action claims were timely filed . . . . The plaintiffs would have [had] to file two lawsuits in order to toll the statute [of repose].

Finally, plaintiffs continue, had the *Ruff* class later been decertified, those plaintiffs "who had been relying on the class action [w]ould suddenly find their claims against Dryvit [time] barred by the statute of repose."

While plaintiffs' objections engender concern, Dryvit properly points us to *Monson v. Paramount Homes, Inc.*, 133 N.C. App. 235, 515 S.E.2d 445 (1999). In *Monson,* this Court reiterated the rule that "[w]hile equitable doctrines may toll statutes of limitation, *they do not toll substantive rights created by statutes of repose." Id.* at 240, 515 S.E.2d at 449 (citation omitted) (emphasis added); *see State Ex. Rel. Long v. Petree Stockton, L.L.P.,* 129 N.C. App. 432, 445, 499 S.E.2d 790, 798 (1998) ("equitable doctrines do not toll statutes of repose"), and *Stallings v. Gunter,* 99 N.C. App. 710, 716, 394 S.E.2d 212, 216 (fraudulent concealment cannot operate to toll running of the statute of repose because "[s]ubstantive rights, such as those created by the statute of repose, are not subject to tolling"), *disc. review denied,* 327 N.C. 638, 399 S.E.2d 125 (1990); *see also Black v. Littlejohn,* 312 N.C. 626, 633, 325 S.E.2d 469, 475 (1985) (statute of repose "serves as an unyielding and absolute barrier that prevents a plaintiff's right of action even before his cause of action may accrue"). We are bound by *Monson* and *Long. See In the Matter of Appeal from Civil Penalty,* 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("[w]here a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court").

In addition to *American Pipe* and *Burnett v. New York Central R. Co.,* 380 U.S. 424, 13 L. Ed. 2d 941 (1965), which speak only to tolling of statutes of *limitation,* not statutes of *repose,* the dissent cites *Bryant v. Adams,* 116 N.C. App. 448, 448 S.E.2d 832 (1994), and *One North McDowell Assn. v. McDowell Development Co.,* 98 N.C. App. 125, 389 S.E.2d 834 (1990), to sustain the conclusion that equitable doctrines prevent running of applicable statutes of repose. Like *American Pipe* and *Burnett, Bryant* and *McDowell* are inapposite.

Neither *Bryant* and *McDowell* addressed the issue of equitable tolling, but rather simply stand for the proposition that equitable estoppel may "*defeat* a statute of repose defense." *Bryant,* 116 N.C. App. at 460, 448 S.E.2d at 838 (emphasis added). *Bryant* held that where "a complaint on its face sufficiently states a claim" of equitable estoppel, the statue of repose may not be asserted as a defense. *Id.* In *McDowell,* the defendants similarly were held estopped from raising

CACHA v. MONTACO, INC.

[147 N.C. App. 21 (2001)]

the statute of repose as a defense because filing of plaintiffs' action had been delayed based upon representations by the defendants. *McDowell* at 128, 389 S.E.2d at 836. Significantly, no claim of equitable estoppel, involving, *inter alia*, elements of "conduct . . . amount[ing] to a false representation or concealment of material facts," *Bryant* at 469, 448 S.E.2d at 460 (quoting *Hensell v. Winslow*, 106 N.C. App. 285, 290-91, 416 S.E.2d 426, 430, *disc. review denied*, 332 N.C. 344, 421 S.E.2d 148 (1992)), and detrimental reliance, *id.*, was raised by plaintiffs in the case *sub judice*. Accordingly, the statute of repose as to plaintiffs' claims against Dryvit was not tolled by the filing of *Ruff* as a class action.

[3] Lastly, we consider plaintiffs' assignments of error directed at the trial court's grant of summary judgment in favor of Montaco and American Drywall. The parties appear to agree our disposition thereof is governed by the statute of repose applicable to improvements to real property, G.S. § 1-50(a)(5)(a), and an exception thereto provided in G.S. § 1-50(a)(5)(e).

The former section provides as follows:

No action to recover damages based upon or arising out of the defective or unsafe condition of an improvement to real property shall be brought more than six years from the later of the specific last act or omission of the defendant giving rise to the cause of action or substantial completion of the improvement.

G.S. § 1-50(a)(5)(a).

This Court has reasoned that:

The logical interpretation of our statute includes classifying the later of the last act or omission or date of substantial completion as the date at which time the party (contractor, builder, etc.) has completed performance of the improvement contract.

*Monson*, 133 N.C. App. at 241, 515 S.E.2d at 450. A failure to perform or to complete performance may thus constitute a "last omission." *Id.* In the instant case, the essentially uncontroverted evidence was that the last act or omission of American Drywall occurred no later than 15 July 1991.

Montaco cites *Nolan v. Paramount Homes, Inc.*, 135 N.C. App. 73, 518 S.E.2d 789 (1999), *disc. review denied*, 3510 N.C. 359, 542 S.E.2d 214 (2000). In *Nolan,* this Court held the house at issue therein had become " 'substantially completed' for purposes of

[]G.S. § 1-50(a)(5)," *id.* at 76, 518 S.E.2d at 791, on the date the Durham City-County Inspections Department issued a "certificate of compliance" for the structure, confirming it had been constructed "in compliance with all applicable building and zoning ordinances." *Id.* We explained that

> N.C.G.S. § 1-50(a)(5)(c) defines "substantial completion" as being "that degree of completion of a project [or] improvement . . . upon attainment of which the owner can use the same for the purpose for which it was intended." An owner of a residential dwelling may use it as a residence when the appropriate government agency issues a final certificate of compliance. The owner may then utilize the residence for the purpose for which it was intended and the home is substantially completed under N.C.G.S. § 1-50(a)(5).

*Id.* at 76, 518 S.E.2d at 791. In the case *sub judice*, the Town of Cary issued its Certificate of Occupancy regarding plaintiffs' residence on 20 September 1991.

However, it is unnecessary to specify the date or dates herein upon which the statute of repose on plaintiffs' claims against American Drywall and Montaco began to run. By failing to argue otherwise, *see* N.C.R. App. P. 28(a) (appellate "review is limited to questions . . . presented in the several briefs"), plaintiffs *sub silentio* concede such claims were barred unless falling within the following statutory exception to the real property statute of repose:

> The limitation prescribed by this subdivision shall not be asserted as a defense by any person who shall have been guilty of fraud, or *willful or wanton negligence* in furnishing materials, in developing real property, in performing or furnishing the design, plans, specifications, surveying, supervision, testing or observation of construction, or construction of an improvement to real property, or a repair to an improvement to real property, or to a surety or guarantor of any of the foregoing persons, or to any person who shall wrongfully conceal any such fraud, or willful or wanton negligence.

G.S. § 1-50(a)(5)(e) (emphasis added).

"[W]ilful and wanton negligence encompasses conduct which lies somewhere between ordinary negligence and intentional conduct." *Siders v. Gibbs,* 39 N.C. App. 183, 186, 249 S.E.2d 858, 860 (1978).

"Negligence . . . connotes inadvertence. Wantonness, on the other hand, connotes intentional wrongdoing. . . . Conduct is wanton when in conscious and intentional disregard of and indifference to the rights and safety of others."

*Duncan v. Ammons Construction Co.*, 87 N.C. App. 597, 601, 361 S.E.2d 906, 909 (1987) (quoting *Hinson v. Dawson*, 244 N.C. 23, 28, 92 S.E.2d 393, 396-97 (1956)). Stated otherwise, " '[a]n act is wanton when it is done of wicked purpose . . . ,' " *Yancey v. Lea*, 139 N.C. App. 76, 79, 532 S.E.2d 560, 562 (2000) (quoting *Foster v. Hyman*, 197 N.C. 189, 191, 148 S.E. 36, 37-38 (1929)), *aff'd*, 354 N.C. 48, 550 S.E.2d 155 (2001), and wilful negligence is the "deliberate purpose not to discharge some duty necessary to the safety of the person or property of another," *Siders*, 39 N.C. App. at 187, 249 S.E.2d at 186.

Regarding Montaco, the "Eleventh Claim" of plaintiffs' amended complaint set out the following allegations of "gross negligence," *see Cole v. Duke Power Co.*, 81 N.C. App. 213, 219, 344 S.E.2d 130, 133-4 (1984), *disc. review denied*, 318 N.C. 281, 347 S.E.2d 462 (1986) ("[g]ross negligence is negligence of an aggravated character and a gross failure to exercise reasonable care"; "*[t]he term implies a thoughtless disregard of consequences without exerting any effort to avoid it*") (emphasis in original), which plaintiffs now point to as indicative of wilful and wanton negligence:

(a) [f]ailing to adequately research [the feasibility of using EIFS on plaintiffs' home];

(b) [f]ailing to adequately follow the manufacturer's applicable specifications, details, and application requirements for the EIFS utilized on plaintiffs' house;

(c) [f]ailing to effectively familiarize its supervisory personnel with proper EIFS application methods and techniques . . .;

(d) [f]ailing to properly coordinate and integrate the EIFS with other building components . . .;

(e) [a]ltering aspects of construction intended to protect homes from harmful water intrusion . . .; and

(f) [f]ailing to assist and instruct plaintiffs in the proper maintenance, repairs, or replacement of the EIFS . . . .

In the same section of the amended complaint, plaintiffs' "gross negligence" allegations against American Drywall included:

CACHA v. MONTACO, INC.

[147 N.C. App. 21 (2001)]

(a) . . . attempt[ing] to remove from its contract, aspects of the application specifications which were known to routinely fail;

(b) . . . knowingly install[ing] a barrier system which American Drywall knew could not adequately drain water intrusion through the windows, and into the wall assembly;

(c) . . . fail[ing] to warn or instruct [Montaco] that [roof and window flashings] required proper integration with the EIFS in order for EIFS to form an effective barrier; [and]

(d) violat[ing] the North Carolina Building Code by . . . cutting away the black plastic flashing around windows which allowed water to drain into the wall assembly.

In his deposition introduced at the summary judgment hearing, Harvey Lynwood Montague, Jr. ("Montague"), President of Montaco, related that plaintiffs' home was the first built by Montaco using the EIFS. Montague stated he had decided to use synthetic stucco because he thought it was a good product and he liked its appearance after inspecting several homes constructed with the product. Montague indicated the EIFS manufactured by Dryvit was chosen because it was "the best product for the best price on the market." He further testified he had discussed application of the EIFS with Steve Matthews ("Matthews"), President of American Drywall, and was told American Drywall had their best crew installing it. According to Montague, he was "confident" during construction that Matthews was doing the work correctly and according to Dryvit's specifications, and that plaintiffs' house was caulked well. In conclusion, Montague stated that EIFS "wasn't supposed to get water in it" and that, had he had known the system would not tolerate moisture intrusion, he "would not have built that house."

Matthews testified in his deposition that it was "our belief and intent that the [EIFS] system was installed properly." Concerning the subcontracting issue, Matthews reported he had subcontracted an installer recommended by a Dryvit distributor who "supposedly [was] a responsible applicator and knew how to install the system properly." In addition, American Drywall had checked the subcontractor's references and had worked with it on a previous EIFS project without incident. Matthews further noted that, at the time the EIFS was installed, it was not known that caulking and sealants in the EIFS "routinely failed." Finally, Matthews stated that, at the time plaintiffs' home was constructed, he had no knowledge that any conduct

on the part of American Drywall or its subcontractor, including removal of black plastic flashing, would cause any moisture intrusion problem.

Significantly, moreover, even assuming *arguendo* plaintiffs had introduced evidence tending to show American Drywall knew caulking and sealants in the EIFS often failed, nothing in the record indicates such items were specifically excluded by American Drywall from its contract with Montaco based upon such knowledge. *See Yancey*, 139 N.C. App. at 79, 532 S.E.2d at 562, and *Siders*, 39 N.C. App. at 187, 249 S.E.2d at 186. Further, no evidence was introduced of any violations of the North Carolina Building Code ("the Code"). The witnesses relied upon by plaintiffs testified as to the 1993 version of the Code, *i.e.*, the Code in effect approximately two years following installation of the EIFS in plaintiffs' residence. We also note violation of the Code, standing alone, has been held by this Court to be insufficient "to reach the somewhat elevated level of gross negligence," *Bashford v. N.C. Licensing Bd. for General Contractors*, 107 N.C. App. 462, 467, 420 S.E.2d 466, 469 (1992), much less wilful and wanton negligence, *see Olympic Products Co. v. Roof Systems, Inc.*, 88 N.C. App. 315, 326, 363 S.E.2d 367, 373-74 ("failure to check Code compliance" prior to applying roof system "does not indicate a reckless indifference which rises to the level of wilful or wanton negligence"), *disc. review denied*, 321 N.C. 744, 366 S.E.2d 86 and 321 N.C. 744, 366 S.E.2d 863 (1988); *see also Collins v. CSX Transportation, Inc.*; 114 N.C. App. 14, 24, 441 S.E.2d 150, 155-56 (noting distinction between "gross negligence" and "wilful and wanton negligence"), *disc. review denied*, 336 N.C. 603, 447 S.E.2d 388 (1994).

In short, the essentially uncontradicted evidence before the trial court was to the effect that neither Montaco nor American Drywall had any indication that their conduct in utilizing the EIFS in plaintiffs' home would cause damage to the residence. To the contrary, it appears from the record that Montaco and American Drywall believed the EIFS was properly applied consistent with each defendant's knowledge of home construction, and that neither became aware of problems inherent in the product until after rotting began to be discovered. Both Matthews and Montague testified that had they known the EIFS would fail, it would not have been used in the construction of plaintiffs' home.

To conclude, even if arguably tending to reflect negligence, the record falls woefully short of evidence of any "wicked purpose," *Yancey*, 139 N.C. App. at 79, 532 S.E.2d at 562, or "intentional disre-

gard of and indifference to the rights and safety of others," *Duncan*, 87 N.C. App. at 601, 361 S.E.2d at 909, on the part of Montaco or American Drywall sufficient to withstand defendants' summary judgment motion. *See Starkey v. Cimarron Apartments*; *Evans v. Cimarron Apartments* 70 N.C. App. 772, 774-75, 321 S.E.2d 229, 231 (1984) (evidence defendant landlord knew apartment building had no attic fire walls and failed to correct condition prior to fire did not constitute wilful and wanton negligence), *disc. review denied*, 312 N.C. 798, 325 S.E.2d 633 (1985). Accordingly, plaintiffs' argument, relying upon the wilful and wanton negligence exception contained in G.S. § 1-50(a)(5)(e), fails.

Prior to concluding, we acknowledge *Forsyth Memorial Hospital v. Armstrong World Industries*, 336 N.C. at 438, 444 S.E.2d at 423, wherein our Supreme Court stated that "under section 1-50(5), no statute of repose *may be asserted as a defense* to a claim of willful and wanton misconduct," *id.* at 446, —— S.E.2d at —— (emphasis added). As noted above, the parties characterized the issue before us in terms of the sufficiency of the evidence as opposed to the propriety of the "assert[ion] as a defense," *id.*, by Montaco and American Drywall of the statute of repose in G.S. § 1-50(5). In view of the similarity herein between the questions of sufficiency of allegation and sufficiency of proof, we have elected to address the issue as argued by the parties, *see* N.C.R. App. P. 28(a), and *State v. Cohen*, 301 N.C. 220, 222, 270 S.E.2d 416, 417 (1980) (appellate review limited "to questions that are supported by the arguments made and authorities cited in the [appellate] brief"), and in any event have found the record evidence inadequate to support an issue of fact regarding "wilful and wanton misconduct" on the part of Montaco and American Drywall.

Based upon the foregoing, we hold the trial court did not err in allowing the summary judgment motions of Dryvit, American Drywall and Montaco.

Affirmed.

Chief Judge EAGLES concurs.

Judge HUDSON concurs in part and dissents in part.

Judge HUDSON, concurring in part and dissenting in part.

As to the first issue presented—whether the statute of repose began to run with the closing by plaintiffs or with the purchase of the

EIFS by American Drywall—I concur with the majority. I also concur on the disposition regarding defendant Montaco. However, for reasons that will be explained here, I do not agree that we are bound by *Monson v. Paramount Homes, Inc.*, 133 N.C. App. 235, 515 S.E.2d 445 (1999), on the question of the tolling of the statute of repose by the filing of the class action in *Ruff v. Parex*. I also believe that the plaintiffs' forecast of evidence is sufficient to raise a genuine issue of material fact as to willful and wanton negligence on the part of American Drywall. Therefore, I respectfully dissent with regard to these two issues.

The pertinent procedural history on the statute of repose issue is as follows. The *Ruff* suit was filed on 5 January 1996, well inside the statute of repose period (under the majority holding here, the statute of repose did not run until April of 1997, six years after American Drywall purchased the EIFS). Plaintiffs filed their complaint in this case on or about 19 August 1998, while they were still part of the putative class in the pending *Ruff* case. On 17 June 1999, Judge Tennille entered an order allowing plaintiffs to opt out of the class action in order to pursue their cause of action individually in state court.

Defendants argue that plaintiffs' individual state law claim against Dryvit is barred by the six-year statute of repose found in N.C. Gen. Stat. § 1-50(a)(6) (1999). Plaintiffs argue that the statute of repose was tolled by the filing of the class action against Dryvit in the *Ruff* case. The majority, citing *In the Matter of Appeal from Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989), holds that we are bound to follow *Monson v. Paramount Homes*, which states that, although statutes of limitations may be tolled by equity, statutes of repose in North Carolina may not be tolled by doctrines of equity. *See Monson*, 133 N.C. App. at 240, 515 S.E.2d at 449.

I disagree with the majority for two reasons. First, I do not believe that we are bound to follow *Monson*. Second, and as a result, I believe that the statute of repose was tolled when the plaintiffs in *Ruff* (including these plaintiffs) filed the class action in that suit.

As to the first point, I do not believe we are bound by *Monson*, primarily because the language quoted by the majority is not the holding in the case, but is merely dictum. The actual holding in *Monson* is that the statute of repose found in N.C. Gen. Stat. § 1-50(a)(5) (1999) (statute of repose applicable to improvements to real property) does not begin to run anew each time a repair is made to the property at issue. *See Monson*, 133 N.C. App. at 241-42, 515 S.E.2d at 450 (explain-

ing that N.C.G.S. § 1-50(a)(5) itself specifies that the statute of repose begins to run from "substantial completion," and that a " 'repair' does not qualify as a 'last act' "). Indeed, the Court stated that "[t]he dispositive issue in the present case is whether a repair qualifies as the 'last act or omission' under N.C. Gen. Stat. § 1-50[a](5)." *Id.* at 238, 515 S.E.2d at 448. Thus, the statement that "equitable doctrines . . . do not toll substantive rights created by statutes of repose," *id.* at 240, 515 S.E.2d at 449, is mere dictum, which we are not bound to follow. *See Trustees of Rowan Tech. v. Hammond Assoc.*, 313 N.C. 230, 242, 328 S.E.2d 274, 281 (1985) ("Language in an opinion not necessary to the decision is *obiter dictum* and later decisions are not bound thereby."). Further, the factual context here is so dissimilar to *Monson* as to be distinguishable, even if the above statement were the holding of the case.

Moreover, previous panels of this Court have specifically held that equitable doctrines *are* applicable to statutes of repose. *See Bryant v. Adams*, 116 N.C. App. 448, 460, 448 S.E.2d 832, 838 (1994) ("Equitable estoppel may . . . defeat a defendant's statute of repose defense."), *disc. review denied*, 339 N.C. 736, 454 S.E.2d 647 (1995); *One North McDowell Assn. v. McDowell Development Co.*, 98 N.C. App. 125, 127-28, 389 S.E.2d 834, 836 (stating that "[i]t is well established that the doctrine of equitable estoppel will deny the right to assert a defense based on lapse of time" and concluding that "Defendants are therefore estopped from raising [the statute of repose] in bar of plaintiffs' action"), *disc. review denied*, 327 N.C. 432, 395 S.E.2d 686 (1990). In these two cases, this Court specifically applied equitable doctrines to prevent the application of statutes of repose pursuant to N.C.G.S. § 1-50. *See Douglas v. Sandoz Pharm. Corp.*, No. 1:98CV00911, 2000 WL 33342286, at *6 (M.D.N.C. July 18, 2000) ("North Carolina courts are split on the question of whether equitable estoppel can toll the statute of repose.").

The Court in *Monson* makes no reference to either *Bryant* or *McDowell*. Therefore, I do not believe that we are bound to follow the dicta in *Monson* regarding considerations of equity, when previous decisions of this Court have specifically held otherwise. I believe that, to the extent considerations of equity control the running of the statute of repose here, we are bound by the holdings in *Bryant* and *McDowell* rather than the quoted dictum in *Monson*, and that the statute of repose was tolled as to defendant Dryvit by the filing of the class action in *Ruff*.

**CACHA v. MONTACO, INC.**

[147 N.C. App. 21 (2001)]

This result is consistent with the U.S. Supreme Court decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 38 L. Ed. 2d 713 (1974). In *American Pipe*, the U.S. Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class." 414 U.S. at 554, 38 L. Ed. 2d at 727. Although I recognize that the case before us does not involve a statute of limitations, the equitable principles involved are the same. Here, had plaintiffs remained parties to the class action, their claims against Dryvit clearly would not have been barred by the statute of repose because the class action was filed against defendant Dryvit inside of the six-year limitations period. In light of the fact that the class suit was actually pending and the plaintiffs still part of the putative class when their suit was filed in state court, I can see no reason to treat these plaintiffs more harshly than those in *American Pipe*.

These facts are similar to those in *Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 13 L. Ed. 2d 941 (1965), relied upon by the U.S. Supreme Court in *American Pipe*. In *Burnett*, the plaintiff timely filed his Federal Employer's Liability Act ("FELA") suit in Ohio state court, but the case was dismissed for improper venue under state procedural rules. *See* 380 U.S. at 424-25, 13 L. Ed. 2d at 943. In federal courts and in some states, such cases may be transferred to a court where venue is proper; in Ohio, however, the rules required plaintiff to file a new suit within a specified time period. *See id.* at 430-32, 13 L. Ed. 2d at 946-48. Eight days after the dismissal of his suit by the state court, but outside the FELA statute of limitations period, the plaintiff filed an identical suit in federal court. *See id.* at 425, 13 L. Ed. 2d at 943.

The Court held that the original filing had tolled the statute of limitations during the pendency of the state suit, and thus, the federal suit was timely filed. *See id.* at 435, 13 L. Ed. 2d at 949. In its discussion, the Court noted that in other circumstances the FELA limitations period had been extended, *see id.* at 427, 13 L. Ed. 2d at 944-45, and that "Congress would not wish a plaintiff deprived of his rights when no policy underlying [the] statute of limitations is served in doing so," *id.* at 434, 13 L. Ed. 2d at 949. The Court identified the policies underlying statutes of limitations as follows:

> Statutes of limitations are primarily designed to assure fairness to defendants. Such statutes promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and

witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation . . . .

*Id.* at 428, 13 L. Ed. 2d at 945 (internal quotation marks omitted). These policy reasons are virtually indistinguishable from those articulated as the basis for the statutes of repose in our State. As our Supreme Court has observed, the statute of repose was intended to shield defendants from " 'open-ended' liability," and its advantages are certainty and the "eliminat[ion of] tenuous claims involving older products for which evidence . . . may be difficult to produce." *Tetterton v. Long Manufacturing Co.*, 314 N.C. 44, 54, 332 S.E.2d 67, 73 (1985) (internal quotation marks omitted).

The purposes of the statute of repose are not offended by allowing the plaintiffs here to proceed, since they have already sued Dryvit, and the class suit is ongoing. Dryvit has been defending the suit and will doubtless continue to do so, whether or not these plaintiffs proceed individually. In fact, the only parties adversely affected by the operation of the statute of repose are these plaintiffs, who did not "sit on their rights," or file a "stale" claim, but would nonetheless have their claims defeated. Accordingly, since I believe that we may apply considerations of equity, I would follow *American Pipe* and *Burnett* and hold that in these circumstances the plaintiffs are not barred.

As to the defendant American Drywall, I believe that the evidence was sufficient on the issue of willful or wanton negligence to raise a genuine issue of material fact on the question of the application of the statute of repose to them. *See* N.C. Gen. Stat. § 1-50(a)(5)(e) (1999); *Forsyth Memorial Hospital v. Armstrong World Industries*, 336 N.C. 438, 446, 444 S.E.2d 423, 428 (1994). Steven W. Matthews was project manager on the plaintiff's house for American Drywall, who subcontracted the application of the EIFS to David Davis. In his deposition, Matthews acknowledged that he knew that the EIFS was a "barrier system" that is dependent upon sealing to keep out moisture, that the system had to be installed properly to prevent water intrusion, and that it was important to follow the specifications of Dryvit for the system to operate properly. He further acknowledged that he did not check to see if the applicator's work complied with the Dryvit specifications, that based on verbal instructions, he allowed work on sealants and caulk joints to be done in a manner which could have been a "fairly significant deviation" from the Dryvit specifications,

and that he was not familiar with the requirements of the building code. I believe that all of these statements and other evidence forecast in the record raise a genuine issue of material fact regarding whether Matthews acted with "a deliberate purpose not to discharge a legal duty . . . to . . . the person or property of another." *Siders v. Gibbs*, 39 N.C. App. 183, 187, 249 S.E.2d 858, 860 (1978). Accordingly, I would remand for trial as to American Drywall.

In sum, I concur in part in that I would affirm the granting of summary judgment against Montaco, and I agree with the majority analysis as to when the statute of repose began to run against Dryvit. Believing that the filing of the class suit in *Ruff v. Parex* tolled the running of that statute, however, I would remand for trial against Dryvit. Because I believe that there are genuine issues of material fact pertaining to defendant American Drywall, I would remand for trial against that defendant as well. Thus, I respectfully concur in part and dissent in part.